**UNITED STATES of America**

v.

**Thomas PECORA and Dante Martire, Appellants.**

**No. 12749.**

United States Court of Appeals Third Circuit.

Argued April 20, 1959.

Decided May 19, 1959.

Michael vonMoschzisker, Philadelphia, Pa., Thomas R. Eddy, Pittsburgh, Pa., for appellants.

Hubert I. Teitelbaum, Pittsburgh, Pa., for appellee.

Before MARIS, GOODRICH and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from conviction of the defendants under 302(b) of the Taft-Hartley Act. 61 Stat. 157 (1947), 29 U.S.C.A. § 186(b) (1956).[1] The section provides:

> "It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value."

The defendants were business agents and members of the Executive Board of Local 1058, International Hod Carriers, Building and Common Laborers Union.

The employers concerned were doing business as Black Top Paving Company. This company had a contract with the Pennsylvania Department of Highways to widen and resurface Pennsylvania Route 71. There was evidence from which the jury could find that after several·interviews Wiggins, one of the partners, paid $200.00 to Martire and Pecora to buy labor peace. Following their conviction they raised on appeal three points which will be considered in order.[2]

## I.

The defendants say that Black Top had no employees at the time the money was paid to them. The alleged payment was made on December 19, 1951,

---

1. Section 302(d) provides that "Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both." 61 Stat. 158, 29 U.S.C.A. § 186(d) (1956).

2. The opinion of the District Court, W.D. Pa., is reported at 173 F.Supp. 764.

but on December 13, 1951, work stopped on this highway improvement because the weather was too bad to continue. There was testimony from Mr. Wiggins, however, that the workmen kept in touch with either him or the foreman in the weeks following. The weather continued unfavorable and finally on February 13, 1952 the work was closed down for the winter and opened up again in March of that year. Several of the employees who had joined Local 1058 began work again in the spring; others did not. These laborers were employed from day to day and were free to quit work if they wished to do so at any time. But there was a provision in the contract between Black Top and the Laborers' District Council that men who left Black Top's employ during the duration of the contract could not take a job with another heavy construction or highway contractor without the consent of Black Top and the other contractor.[3] To this extent the employees were not completely free to accept employment elsewhere although they could quit Black Top if they pleased.

The point made by the defendants, that at the time of the taking of the money Black Top had no employees, was before the court during the trial. The defendants asked for instruction on this point:

"If you find that the common laborers left the job on December 13, 1951, that no such laborers returned to work till March or April of 1952, and that they were not subject to call, then the Government has not proved beyond a reasonable doubt that these men were employees of Black Top Paving Company on December 19, 1951, and you must find the defendants not guilty."

The court did not give this instruction but instead charged the jury in these words:

"In this connection it is not necessary that the employees of Black Top

Paving Company were actually working at the time of the alleged offense, it being sufficient even though they were laid off at the time that their employment was not permanently terminated."

We think that instruction the court gave was adequate. As the appellants' argument develops it appears that they concede that if the work was closed down because of bad weather for a day or so or for a holiday or something of that sort, the employees would still remain as employees. There are plenty of decisions which show that because a man is not at work at a particular day he does not necessarily lose his right as an employee. See e. g., North Whittier Heights Citrus Ass'n v. N.L.R.B., 9 Cir., 1940, 109 F.2d 76, 82; N.L.R.B. v. Waterman Steamship Corp., 1940, 309 U.S. 206, 207, 213–219, 60 S.Ct. 493, 84 L.Ed. 704.

We think the phrasing of the request on behalf of the defendants was somewhat misleading. The laborers who could not work on December 14 because the weather was bad were subject to call in the sense that they kept in touch with the employer to see whether work could be resumed. But if they did not respond to a summons to work, they did not commit a breach of contract for they were free to quit when they pleased. The requested instruction would tend to confuse the jury.

On the other hand, what the trial judge said was not misleading. The appellants complain of the use of the word "permanently" and make earnest arguments on the distinction between "permanently" and "temporarily." But an instruction to a jury need not lead us to dictionary definitions to decide whether the problem is in understandable form. What the judge told the jury read in connection with the remainder of his charge left them with a pretty clear picture of what

---

**3.** The contract between Black Top and the Laborers' District Council incorporated by reference the terms of the general contract between the Contractors Association of Western Pennsylvania and the Heavy Construction, Railroad Contracting and Highway Construction Council. Black Top did not become a member of the Contractors Association until 1952.

they had to decide. That is the test and that was satisfactorily met.

## II.

The second point appellants make is that this Union did not represent a majority of the Black Top employees and, therefore, could not come under the prohibitions of the Act.

The factual part of the statement is supported by evidence. There was an agreement between Black Top and the Union that the employees would be required to join 1058 within 30 days following their employment and there was testimony from which it could be found that this requirement was not lived up to. If this were a case involving the question whether the Union represented a majority of the employees the point appellants make would have force and the cases cited would be authority for us.

But all this argument is obsolete in view of the Supreme Court's decision in United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335. The Supreme Court there rejected the conclusion that the section of the statute was limited to include only the exclusive bargaining representatives and said that the section "prohibits payments by employers to individuals who represent employees in their relations with the employers." 350 U.S. at page 307, 76 S.Ct. at page 405. The Ryan decision was followed and applied by the Eighth Circuit in Brennan v. United States, 1957, 240 F.2d 253, 264. These cases are conclusively against the appellants on this point. While the Union representatives did not constitute a majority of those who worked for Black Top, nevertheless, there were some Union members in the Black Top crew. The question of the authority of Pecora and Martire to represent them was left to the jury under understandable instructions and that body's conclusion is unassailable here.

## III.

The third point made by the defendants is that the enterprise conducted by Black Top does not affect interstate commerce.

The job Black Top contracted to do was the resurfacing and widening of Pennsylvania Route 71. This road begins 11 or 12 miles east of Washington, Pennsylvania, and goes in a northeasterly direction to the city of Greensburg, Pennsylvania. It is a feeder route from Route 40 to 30 and also feeds Route 51. All three of these routes run through more than one state. Route 71 is included in the federal system of highways. The trial judge told the jury this:

"  *  *  *  the testimony to the effect that the road being constructed was to accommodate interstate traffic to any extent or that materials used in its construction were acquired from out of the state, either of which events would characterize the work being performed by Black Top Paving Company as affecting interstate commerce within the requirements of this element of the offense."

The appellants emphasize the use of the words "to any extent." We do not find this criticism well-founded. We can take judicial notice of the fact that these interstate highways affect interstate commerce and that feeder roads to them necessarily do so. We think an actual count of the number of cars on Route 71 bound for some point outside Pennsylvania is not necessary. The question in this respect is something like Mitchell v. C. W. Vollmer & Co., Inc., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196, where employees engaged in construction of a lock which, when completed, was to be part of the Gulf Intercoastal Waterway, were held to be within federal authority. And see Archer v. Brown & Root, Inc., 5 Cir., 241 F.2d 663.

It was in evidence that for this job clay pipe, used for tile under-drain, had been shipped in from Ohio. In addition, liquid asphalt was shipped in from Maryland specifically for the paving of Route 71. This asphalt was stored in Pennsylvania and eventually mixed with slag aggregate

to make the black top for the highway. It is argued that the asphalt had come to rest in Pennsylvania before use and that the interstate commerce phase had ceased.

Our decision in United States v. Stirone, 1958, 262 F.2d 571, certiorari granted 1959, 79 S.Ct. 897, makes further discussion of this point unnecessary. Indeed, this case does not require us to go nearly as far as the majority of our Court did in Stirone. The only difference among us there had to do with the construction of the building which was to make materials to be shipped later in interstate commerce. We had no disagreement about the application of the statute to material which came into Pennsylvania from outside the state even though it was not immediately used in the manufacturing process.

The judgment of the district court will be affirmed.