UNITED STATES of America,
Appellee,

v.

Vincent J. RICCIARDI, Appellant.

UNITED STATES of America,
Appellee,

v.

Stanley M. UNGER, Appellant.

Nos. 135, 146, Dockets 29796, 30015.

United States Court of Appeals
Second Circuit.

Argued Nov. 15, 1965.

Decided Feb. 4, 1966.

Certiorari Denied May 16, 1966.
See 84 S.Ct. 1464.

George Wolf, New York City, for appellant Ricciardi.

Vincent J. Fuller, Washington, D. C. (Robert L. Weinberg, Washington, D. C., with him on the brief), for appellant Unger.

Neil Peck, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, New York City, and Richard A. Givens and Douglas S. Liebhafsky, Asst. U. S. Attys., on the brief), for appellee.

Before MEDINA, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge:

In 1964 Vincent J. Ricciardi and Stanley M. Unger, Vice-President and Secretary-Treasurer, respectively, of Local 32–E of the Building Service Employees International Union, both were indicted under 29 U.S.C. § 186 for knowingly demanding and receiving money from employers of whose employees Ricciardi and Unger were representatives. During the years in question, Local 32–E had approximately 8,000 members, most of them building superintendents of apartment houses in Bronx and Westchester Counties, New York, but some of them employed in various country clubs in the area, at race tracks, in a department store, and in an amusement park. Unger worked primarily for Local 32–E itself; Ricciardi was in charge of Council 7, a subdivision of Local 32–E representing employees in small apartment buildings, generally with 30 or less apartments. The employers who made the payments which were the subject of the indictments

against Ricciardi and Unger were owners of apartment houses in the Bronx.

After trial before Judge Weinfeld, the jury found Ricciardi guilty on fifteen counts. He was sentenced to one year on each of the first fourteen, the sentences to be served concurrently, and was given a suspended sentence of one year on the fifteenth count. After trial before Judge Murphy, the jury found Unger guilty on three counts. He was sentenced to one year on each count, the sentences to be served concurrently.

Ricciardi and Unger were tried separately. In the appeals before us, Ricciardi challenges only the existence of jurisdiction under the statute; Unger challenges not only the existence of jurisdiction but also the indictment, the trial court's construction of the substantive provisions of the statute, and the sufficiency of the evidence under the substantive provisions of the statute.

## I. *Jurisdiction Under the Statute.*

■ The indictments against both Ricciardi and Unger were phrased in terms of subsections (b) (1) and (a) (1) of 29 U.S.C. § 186. Read together, the two subsections make it unlawful "to request, demand, receive, or accept, * * any payment, loan, or delivery of any money or other thing of value," 29 U.S.C. § 186(b) (1), from an employer "to any representative of any of his employees who are employed in an industry affecting commerce * * *," 29 U.S.C. § 186 (a) (1). The jurisdictional test for the cases against both appellants is therefore: are any of the employees of the employers who made the payments "employed in an industry affecting commerce"? 29 U.S.C. § 142(1) defines "industry affecting commerce" as "any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce"; and "commerce" in turn is defined by 29 U.S.C. § 152(6) to mean "trade * * * among the several States * * *."

Although in both cases now before us the jurisdictional question was submitted to the jury, the question of what activities constitute an "industry affecting commerce" under 29 U.S.C. § 186 has almost always been regarded as a question of law for the court to decide, leaving to the jury only the determination of what activities the defendant had in fact engaged in. United States v. Gibas, 300 F.2d 836, 839 (7th Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962); United States v. Pecora, 173 F.Supp. 764 (W.D.Pa.1958), aff'd, 267 F.2d 512 (3d Cir. 1959); see United States v. Donovan, 339 F.2d 404, 410 (7th Cir. 1964). The same allocation of function between court and jury has also been made under the similar Hobbs Act, 18 U.S.C. § 1951, which proscribes the obstruction of commerce by robbery or extortion. United States v. Green, 246 F.2d 155, 160–161 (7th Cir.), cert. denied, 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957); United States v. Lowe, 234 F.2d 919, 922 (3d Cir.), cert. denied, 352 U.S. 838, 77 S.Ct. 59, 1 L.Ed.2d 56 (1956); United States v. Varlack, 225 F.2d 665, 670, 672 (2d Cir. 1955); Hulahan v. United States, 214 F.2d 441, 445–446 (8th Cir.), cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954); Nick v. United States, 122 F.2d 660, 673, 138 A.L.R. 791 (8th Cir.), cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941).

### A. *Ricciardi.*

Ricciardi maintains, not that the submission to the jury of the jurisdictional question was prejudicial to him, but that improper standards were used to resolve the question and that there was insufficient evidence to support a finding that the employees worked in an "industry affecting commerce."

■ Ricciardi claims in particular that a charge should have been given to the effect that the exclusive handling by the New York State Labor Board of labor disputes in multiple dwellings was evidence that the operation of such buildings did not affect interstate commerce. We

disagree and hold that the trial judge was under no obligation to tell the jury to consider what the New York Board thought its jurisdiction was, in determining whether the operation of the buildings "affects commerce."

Nor did the trial judge err in instructing the jury that it could consider that the industry in question included all apartment houses in the Bronx with 30 or less apartments, whether or not they had contracts with Council 7 of Local 32–E. The general statutory definition in 29 U.S.C. § 142 (1) makes clear that an industry may be one "affecting commerce" if a labor dispute in the industry would tend to burden commerce. To apply this jurisdictional test, the relevant industry must first be determined. 29 U.S.C. § 186(a) (1) and (b) (1) prohibit payment and the receipt of payment from an employer "to any representative of any of his employees who are employed in an industry affecting commerce." To confine the term "industry" to the business activities of the employers who made the allegedly unlawful payments, or to the business activities of employers whose employees were represented by the recipients of such payments from employers, would be contrary to the broad connotations of the term "industry." Instead, the relevant industry for the purposes of 29 U.S.C. § 186(a) (1) and (b) (1) comprises all business activities in the same field as the business activities of employers whose employees were represented by the recipients of the allegedly unlawful payments. Applying this test, it was not error for the trial court to instruct the jury that the relevant industry was "the ownership, operation and management of apartment houses in the Bronx of 30 or less apartments."

Ricciardi's challenge to the sufficiency of the evidence of jurisdiction must also fail. There was no dispute that the superintendents represented by Local 32–E ran the furnaces for their buildings, nor that the fuel for those furnaces, although purchased from local distributors, came ultimately from out of state. Ricciardi argues that the amount of fuel used in the small apartment houses in the Bronx whose owners made payments to him was so small that it could have no "significant effect upon the stream of commerce," and could not deflect its flow "by so much as a microscopic ripple." But the President of Local 32–E and Ricciardi himself testified that in 1959 Council 7 of Local 32–E, the subdivision headed by Ricciardi, represented employees in between 700 and 1,000 buildings with 30 or less apartments. A number of employers who made pay-offs to Ricciardi testified that their fuel bills ran from $1,200 (for a 20-unit building) to $4,500 (for a 28-unit building) a year; and no evidence was offered by Ricciardi which would indicate that these figures were not representative of the industry.

To be sure, there was no testimony which said in so many words that a strike by the superintendents of the buildings with 30 or less units, who were represented by Council 7 of Local 32–E, would tend to curtail interstate commerce; but the Government should not be penalized for its failure to belabor the obvious. As Mr. Justice Metcalf wrote in Commonwealth v. Peckham, 68 Mass. (2 Gray) 514, 515 (1854): "Jurors are not to be presumed ignorant of what everybody else knows. And they are allowed to act upon matters within their general knowledge, without any testimony on those matters." See also Rostad v. Portland R'y, Light & Power Co., 101 Or. 569, 581, 201 P. 184, 188 (1921) ("[t]riers of fact cannot, in the nature of things, be divested of general knowledge of practical affairs"); McCormick, Evidence § 324 at p. 691 (1954); 9 Wigmore, Evidence § 2569 (3d ed. 1940); Morgan, Judicial Notice, 57 Harv.L.Rev. 269, 272 (1944). If a jury does not need to be told that gin is intoxicating, Commonwealth v. Peckham, supra, or that good rugs are valuable, Shikany v. Salt Creek Transp. Co., 48 Wyo. 190, 45 P.2d 645 (1935), or that spare parts were difficult to obtain in this country during 1943 and 1944, Holt v. Pariser, 161 Pa. Super. 315, 54 A.2d 89 (1947), the jury here did not need to be told that a strike

or a slow-down by employees who run machines would affect the amount of material used in the machines. Cf. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). To paraphrase Rule 9 of the Uniform Rules of Evidence, the proposition is one of generalized knowledge so universally known that it cannot reasonably be the subject of dispute. The jury could apply this proposition to the testimony before it as to the responsibilities of the building superintendents and as to the amount of fuel used in the buildings, and conclude that a labor dispute in the industry would interfere with the sale or distribution of out-of-state fuel on other than a *de minimis* basis.

■ The Supreme Court has repeatedly said that in passing the National Labor Relations Act, Congress intended the coverage of the Act to reach to "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause." NLRB v. Reliance Fuel Oil Co., 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963); see Guss v. Utah Labor Relations Bd., 353 U.S. 1, 3, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957). The same may fairly be said of the congressional intent as to the statute now under consideration, since the Labor-Management Relations Act of 1947, of which the predecessor of the present 29 U.S.C. § 186 was a part, referred to the definition of "commerce" used in the National Labor Relations Act, see 29 U.S.C. § 142(3), and since the definition of "industry affecting commerce" in the new act, 29 U.S.C. § 142(1), closely parallels the definition of "affecting commerce" in the National Labor Relations Act, 29 U.S.C. § 152(7). On the basis of evidence introduced by the Government and common knowledge as to the effects of strikes and slow-downs, there is no question but that the activities here in question fall within the permissible reach of the commerce clause. See Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (Civil Rights Act of 1964, as applied to a restaurant buying less than half its food supplies—some

$69,683 a year—from out of state, held constitutional); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (Congress under the commerce clause can set limits to wheat production even if the farmer consumes all of his own production on his farm); United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); NLRB v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014 (1939).

We hold that proper standards were used to resolve the jurisdictional question and that there was sufficient evidence of jurisdiction under the statute in Ricciardi's case.

B. *Unger.*

Unger's challenge to jurisdiction under the statute raises somewhat different problems than Ricciardi's similar challenge, since different evidence was introduced in support of jurisdiction and since the trial judge's conception of the proper jurisdictional test differed from the test used by the judge before whom Ricciardi was tried.

The indictment against Unger was couched in terms of 29 U.S.C. § 186(a) (1) and (b) (1), under which the correct jurisdictional test is: are any of the employees of the employers who made the payments "employed in an industry affecting commerce"? This was the test employed by the trial judge in Ricciardi's case. In Unger's case, however, the trial judge denied a requested charge to this effect, and charged instead that the test is "whether the employers of all the employees in the union are in an industry affecting commerce." The charge given permitted the jury to consider on the question of jurisdiction not only the fuel purchased by the apartment houses but also the out-of-state aspects of the race-tracks and the department store at which members of other branches of Local 32–E were employed.

■ We believe that this instruction, although erroneous, was not prejudicial to Unger, because the undisputed evidence establishes jurisdiction under the statute as a matter of law.

The president of Local 32–E testified without contradiction that this local, which represented employees of the employers who made the payments to Unger, had organized approximately 5,500 apartment buildings in Bronx and Westchester Counties by 1959; that members of Local 32–E were superintendents of these buildings; and that the superintendents were responsible for servicing the heating systems in the buildings. It was stipulated between the parties that the oil, coal, and gas used as fuel in the buildings, although purchased from local distributors, came from outside of New York State.

The Government adduced no proof of the dollar volume of the fuel consumed in apartment buildings organized by Local 32–E; nor was there any testimony to the effect that a strike or slow-down by the superintendents would affect the purchase of fuel used in these buildings. But in the words of Coleridge, J., "Judges are not necessarily to be ignorant in Court of what every one else, and they themselves out of Court, are familiar with." Lumley v. Gye, 2 El. & Bl. 216, 267, 118 Eng.Rep. 749, 768 (Q.B. 1853). In deciding what constitutes an "industry affecting commerce" as a matter of law, we may take judicial notice of the obvious and the indisputable. It cannot be disputed that the amount of fuel used in 5,500 apartment buildings is substantial, and has a substantial dollar value. Nor can it be disputed that a slow-down or strike by the superintendents who run the heating systems would affect the amount of fuel used in the buildings in a significant way. Of course we cannot decide whether the effect would be long-lasting: the record affords no information, nor is it common knowledge, whether labor disputes in the apartment building industry in the Bronx and in Westchester are long-lasting, or whether landlords could run the furnaces themselves or get outside help in running them. But we need not decide that the effect upon interstate commerce would be drastic, before we can hold that the Government has satisfied the juris-

dictional requirements of the statute. The statute requires only that a labor dispute in the industry would "tend to burden or obstruct" interstate commerce, 29 U.S.C. § 142(1). Interpreting this phrase in light of the congressional intent that jurisdiction under the statute should be as broad as constitutionally permissible, jurisdiction is established as a matter of law if there is no question but that a labor dispute in the relevant industry would have a palpable effect on interstate commerce. Given the unquestioned evidence of the number of buildings involved and the responsibilities of the superintendents, we can take judicial notice that a labor dispute involving the apartment buildings would have a palpable effect on interstate commerce.

We find support for our action in a long series of cases in which federal courts have taken judicial notice of indisputable facts in appraising the effect of given activities upon interstate commerce. As the Supreme Court said in one of the turning-point cases during the era popularly referred to as the New Deal, effects on interstate commerce "must be appraised by a judgment that does not ignore actual experience." NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 42, 7 S.Ct. 615, 626, 81 L.Ed. 893 (1937). In Murray v. Union Pacific R. R., 77 F.Supp. 613 (N.D.Ill.1948), the court took judicial notice of the nature of the defendant railroad's activities in Illinois, in deciding that service of process upon the defendant in Illinois did not improperly burden interstate commerce. In NLRB v. Vulcan Forging Co., 188 F.2d 927 (6th Cir. 1951), the court held that in determining whether the NLRB had jurisdiction over a company which sold all of its output to Ford Motor Company, judicial notice could be taken of the interstate activities of Ford. In Grand Rapids City Coach Lines v. Howlett, 137 F.Supp. 667 (W.D.Mich.1955), the district court took judicial notice that many of the industries served by the plaintiff bus line were interstate commerce, before it held that the activities of the bus company, although wholly in-

trastate, affected interstate commerce. In Goldberg v. Arnold Bros. Cotton Gin Co., 297 F.2d 520 (5th Cir. 1962), the Fifth Circuit stated that in considering whether cotton gin workers were engaged in the production of goods for interstate commerce, the trial court on remand could take judicial notice of the interstate movement of cotton in Texas, if it appeared to be of general knowledge and authoritatively settled. Finally, in United States v. Pecora, 267 F.2d 512 (3d Cir. 1959), a case arising under 29 U.S.C. § 186, the trial court had instructed the jury that if a state road being built by employees represented by the defendant "was to accommodate interstate traffic to any extent," this satisfied the jurisdictional requirements of the statute. The Third Circuit affirmed, not by approving the instruction of the trial judge, but by taking judicial notice that the state road affected interstate commerce, since it led into interstate highways. The court said that an actual count of the number of cars on the road bound for some point outside of the state was not necessary.

II. *The Adequacy of Unger's Indictment.*

■ Unger argues first that the indictment against him was defective in that it was based on inadequate evidence and should be dismissed unless the Government showed that there was sufficient evidence before the grand jury to establish the "industry affecting commerce" element of the offenses alleged. Courts are extremely reluctant to dismiss indictments because of the inadequacy or incompetence of the evidence before the grand jury. The Supreme Court has repeatedly ruled "that one indictment returned by a legally constituted nonbiased jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment." Lawn v. United States, 355 U.S. 339, 349, 78 S.Ct. 311, 317, 2 L.Ed.2d 321 (1958); Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The refusal

of a trial judge to dismiss an indictment for inadequacy of the evidence before the grand jury will be reversed only in the most unusual circumstances, as in United States v. Tane, 329 F.2d 848 (2d Cir. 1964) (indictment rested almost exclusively on wiretap evidence). Judge Murphy acted well within the scope of his discretion in refusing to dismiss Unger's indictment on this ground.

■ Unger also urges that his indictment was defective in that it did not allege what "industry affecting commerce" was involved, and therefore did not give him adequate notice to enable him to prepare his defense. As we said in United States v. Varlack, 225 F.2d 665, 670 (2d Cir. 1955), in which we upheld a conviction under the Hobbs Act although the indictment did not allege that the "commerce" affected was "interstate commerce":

> "The indictment might well have contained a reference to the nature of the commerce affected and to the other clarifying details suggested by the appellant. The question before us, however, is not whether the indictment filed is, in all respects, the best that could have been drafted but rather, whether the omissions alluded to so completely denuded the charges of so much informative data as to deprive appellant of his right to be apprised of the charge he was required to meet and to be protected against being tried twice for the same offense. This test is a practical one and one which may be met despite the fact that the indictment could have been made more definite and certain. We are satisfied that the indictment filed did fulfill at least these minimal requirements."

As in the *Varlack* case, the defendant here had ample time to move for a bill of particulars to remove such doubts as he may have had about the nature of the offense charged. He did not do so. We also note that other courts have upheld against attack indictments under the same statute which merely alleged that

the employer was engaged in an industry affecting commerce. United States v. Inciso, 292 F.2d 374 (7th Cir.), cert. denied, 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961); United States v. Auto Rental Co., 187 F.Supp. 603 (W.D. Pa.1960); United States v. Lavery, 161 F.Supp. 283 (M.D.Pa.1958).

■ Unger maintains that the indictment should be dismissed as duplicitous, since it charges him with receiving payment both as a representative of employees and as an officer of a labor union, each of which is a separate offense under § 186. United States v. Donovan, 339 F.2d 404 (7th Cir. 1964), cert. denied, 380 U.S. 975, 85 S.Ct. 1338, 14 L.Ed.2d 271 (1965). Even if we were to follow Donovan, however, this case seems distinguishable, since the indictment made clear that it was directed at Unger's receipt of money in his capacity as a representative of employees. The indictment reads " * * * the defendant, a representative of employees who were employed in an industry affecting commerce, to-wit, Secretary-Treasurer, Local 32–E * * *." The "to-wit" indicates that Unger's union office was alleged only to specify the way in which Unger was a representative of the employees.

■ Nor is the indictment duplicitous for charging that Unger did "receive and accept" and did "agree to receive and accept" unlawful payments. The two clauses may state separate offenses, see Burton v. United States, 202 U.S. 344, 377, 26 S.Ct. 688, 50 L.Ed. 1057 (1906); but the offenses were based on the same transactions and carried with them the same penalty, and the indictment was phrased in the conjunctive. Under these circumstances we do not think that the use of both phrases in the indictment could have confused or prejudiced Unger in his defense. See Dranow v. United States, 307 F.2d 545 (8th Cir. 1962); Kitchens v. United States, 272 F.2d 757, 761 (10th Cir. 1959), cert. denied, 362 U.S. 942, 80 S.Ct. 809, 4 L.Ed.2d 772 (1960); Orfield,

Joinder in Federal Criminal Procedure, 26 F.R.D. 23, 33 (1960).

III. *The Trial Court's Construction of the Nonjurisdictional Elements of the Statute.*

Unger maintains that the trial court misconstrued § 186 by charging that the statute:

> does not make conscious wrongdoing a constituent of the crime; it is a criminal provision which outlaws all payments without exceptions not here involved between employer and the representative. In short, if you find that the loans were made beyond a reasonable doubt, it makes no difference whether the defendant and Jakubovitz were old personal friends or whether the defendant did not intend to do any wrong.

■ According to Unger, the prosecution should have to prove that the payment or loan to the employee representative was made *because* the recipient was an employee representative, and not for some other reason such as personal friendship. However, Unger can cite no case which so much as suggests that payment because of personal friendship is a defense. We think the trial court's interpretation of the statute was correct. If the Government had to prove evil motive in every case under the statute, its burden would become very much heavier. It seems reasonable to impute to Congress an intent to outlaw *all* payments, with certain narrow statutory exceptions, from employer to union official. This court so held *per curiam* in United States v. Ryan, 232 F.2d 481, 483 (2d Cir. 1956), saying that the statute forbids payments:

> of all kinds by employers to "representatives", save as excepted * *. True, it then covers gifts, however trifling and innocuous, but we can see no reason on that account to narrow its scope. The penalties prescribed make it apparent that they could not have been meant as sanctions for heinous offences; and Congress may well have wished to put a

stop to the practice, even on occasions inconsiderable and harmless in themselves, rather than to make verbal distinctions that would be troublesome in application. The propriety of any gift to a fiduciary with whose beneficiary the donor is apt to come into competition, is surely open to scrutiny, and it is a reasonable way of dealing with the evils that may be involved to taboo all such rather than to undertake the difficult task of ascertaining the motive in every case.

■ Nor did the trial court err in failing to give Unger's requested charge that the jury must find Unger not guilty unless they find that Unger knew he was violating the law or acted in reckless disregard of the requirements of the law. The trial court in United States v. Ryan held that it was enough if the employee representative received money "with knowledge (1) that he was receiving or accepting money, and (2) that the person who was giving him the money was an employer of employees that he represented." 128 F.Supp. 128, 133 (S. D.N.Y.1955), rev'd on other grounds, 225 F.2d 417 (2d Cir. 1955), rev'd 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956). The Supreme Court indicated that the statute was "a criminal provision, *malum prohibitum*, which outlaws all payments, with stated exceptions, between employer and representative." 350 U.S. at 305, 76 S.Ct. at 404. On remand, we held *per curiam* that the statute covers "situations which do not involve conscious wrongdoing," 232 F.2d 481, 483 (2d Cir. 1956), and referred with approval to the interpretation of the trial court. See also United States v. Keegan, 331 F.2d 257, 262 (7th Cir.), cert. denied, 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964).

IV. *The Sufficiency of the Evidence against Unger.*

■ Unger argues that, as to one of the three counts of which he was convicted, there was insufficient evidence to show that Unger took money from an employer, knowing that the money was intended for him. A little before Christmastime, one Feiber gave Unger an envelope containing various other envelopes, each with sums of money. The envelopes were labelled with the names of various people at the union office. Unger says the evidence indicated that he took only "as a conduit for Feiber's generosity." However, Feiber testified that $50 was meant to be for Unger; and Unger himself admitted that one of the envelopes bore his name. On the basis of this testimony, the jury could well have found beyond a reasonable doubt that Unger knew that some of Feiber's money was intended for him.

V. *The Variance between the Government's Proof against Unger and the Government's Bill of Particulars.*

■ Unger's final argument is that the Government's bill of particulars alleged that two of the employers, Jakubovitz and Feiber, made their loans or payments "for themselves," whereas the Government's proof indicated that Jakubovitz had an interest in apartment houses only as a joint venture and that Feiber's interest in apartment houses was only as a corporate official and shareholder of corporations owning apartment houses. It is hard to see how this variance could have prejudiced Unger. In any case any unfair surprise could have been remedied by a motion for a continuance, which was not made here. See United States v. Glaze, 313 F.2d 757, 760 (2d Cir. 1963); United States v. Burgos, 269 F.2d 763, 767 (2d Cir. 1959).

VI. *Conclusion.*

Both convictions must be affirmed.

WATERMAN, Circuit Judge (concurring):

I concur in the result reached by the majority on the ground that proof of effect on interstate commerce is not required on a case-by-case basis in prosecutions commenced under 29 U.S.C. § 186(a) and (b).

Subsection 186(b) makes it unlawful "for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value" prohibited by subsection (a) of that section. And subsection (a) (1) prohibits an employer from making or agreeing to make any payment, loan, or delivery of money or other thing of value "to any representative of any of his employees who are employed in an industry affecting commerce * * *." 29 U.S.C. § 186(a) (1). 29 U.S.C. § 142(1) states that the term "industry affecting commerce" as used in section 186 "means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce." Finally, 29 U.S.C. § 152(6) states that the term "commerce" means "trade, traffic, commerce, transportation, or communication among the several States * * *." In brief, in order successfully to prosecute Ricciardi and Unger under Section 186(a) and (b) it was incumbent upon the Government to show that the employees of the employers who made the payments to these defendants were in an industry "affecting" commerce. Section 142(1) allowed the Government to make this showing by proving either that the industry or activity in which these employees were employed was itself "in commerce" or that a labor dispute in the industry or activity "would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce."

In Ricciardi's case the Government did not seriously attempt to establish that the employees of the landlords who had made the payments to Ricciardi were in an industry or activity that was itself "in commerce"; instead, the Government sought to establish that these employees were engaged in an industry or activity in which a labor dispute would burden or obstruct commerce. The trial judge ruled that the ownership, operation and management of apartment houses in the Bronx of thirty or less apartments was the relevant industry.[1] It was then established that the number of such apartment houses covered by contracts with the Union numbered between 800 and 1,000 in 1959 and that since then they had increased at the rate of approximately 300 a year so that by 1962 there were nearly 2,000 such buildings. It was also established that fuel bills in this industry ran from $1,200 (for a twenty-unit building) to $4,500 (for a twenty-eight unit building), and it was stipulated that the oil, coal and gas used as fuel in apartment buildings in the Bronx, though purchased by the landlords from local distributors, came from outside the State of New York. At the close of the Government's case, and again after all the evidence had been presented, the trial court denied the defendant's motions to dismiss the indictment and for a directed verdict of acquittal for failure of proof, and instructed the jury that: "If, upon all the evidence you find that the purchase, sale, transportation or distribution of fuel originating outside the state, and normally required by the industry, would be interfered with by a stoppage or strike, then you have sufficient upon which to find that it is an industry affecting commerce."[2] The

1. As Judge Moore correctly states in his opinion, the trial judge in Ricciardi's case correctly ruled that only the particular business in which the employees of the employer (or employers) named in the indictment were engaged comprised the "industry" pertinent to an indictment framed in terms of 29 U.S.C. § 186(a) and (b), but he also held that the jury in considering how commerce might be affected could consider the entire industry of which these businesses were but a part rather than only the businesses of the employers the indictment named.

2. Ricciardi's case went to the jury on the single theory that even though the industry in which the employees of the landlords named in the indictment were engaged was not "in commerce" it might be said to be one "affecting commerce" if the jury could conclude that it was an industry in which a labor dispute would tend to burden commerce.

question to be answered on appeal in Ricciardi's case is whether the trial judge erred in ruling that there was sufficient evidence to allow this issue to go to the jury.

Unger's case, as the majority notes, presents somewhat different questions; there the trial judge seems to have instructed the jury that in deciding whether the employees of the employers who made the payments to Unger were "employed in an industry affecting commerce" the jury might consider the industry or activity of all the employers having contracts with Unger's union and that it did not have to confine its attention to the operation of multiple dwellings in the Bronx, the industry or activity of the employers mentioned in the indictment. I agree with my brothers that in so charging the jury the trial court erred; a proper charge would have limited the jury's consideration to the industry or activity of the employers mentioned in the indictment.[3]

In Unger's case the undisputed evidence established only that the union of which Unger was secretary-treasurer and which represented the employees of the employers who made the payments to Unger had organized by 1959 approximately 5,000 apartment buildings in Bronx and Westchester Counties, that members of this union were superintendents of these buildings and responsible for their heating systems, and, by stipulation, that the oil, coal and gas used as fuel in the buildings were purchased from local distributors but came from outside of New York State. There was no evidence tending to prove the dollar value of the fuel consumed in the apartment buildings organized by Unger's union. The question before us in Unger's case is whether this evidence, without more, suffices to establish that the employees of the employers who made the payments to Unger were "employed in an industry affecting commerce" as a matter of law.

It must be emphasized that at neither trial did the Government adduce any evidence tending to show that a labor dispute in the industry would in fact "affect" commerce by reducing the industry's demand for fuel. Indeed, in *Unger* the trial judge on several occasions noted that there was no evidence relating to an effect on commerce in the case.[4]

Though in affirming both convictions the majority concedes that it was necessary for the Government to establish in each case that a labor dispute in the apartment-house industry would "affect" the industry's demand for fuel, in order to excuse the Government's failure to prove "affect" in either case it invokes the rule that formal proof of facts known at once with certainty is not required.[5] In adopting this view of the Government's case the majority first asserts that unquestionably a strike or slowdown of superintendents who operate apartment-house heating systems would reduce the industry's demand for fuel. Stating that to be so, the majority then says that in Ricciardi's case such an obvious fact need not have been proven at trial, or submitted to the jury for resolution, since jurors would know it of their own knowledge, anyway. And in Unger's case the majority declares that it will take judicial notice of this "obvious" fact, thereby enabling it to affirm Unger's conviction according to the rules set forth in Ricciardi's case.

This approach by the majority is unsatisfactory for it collapses the distinction between two separate issues upon which the Government did not adduce proof in either case; the first is whether a labor dispute between the superintendents and the apartment-house owners would, in fact, decrease the industry's demand for fuel, the second is, assuming that it did occur, whether the decrease

3. See note 1, supra, and accompanying text.

4. See Appendix to Brief for Appellant, pp. 94a–95a, 132a, 163a.

5. See McCormick, Evidence §§ 323–24 (1954).

would be more than *de minimis*. If the first issue could be affirmatively resolved from the evidence of record one could say in Ricciardi's case that the jury might rely on its own experience to conclude that in an industry comprising between 800 and 2,000 apartment buildings, each consuming more than $1,000 in fuel, the decrease would be more than *de minimis*. And assuming the first issue had been affirmatively resolved in Unger's case one could take judicial notice that the effect of the decrease on industry demand would be more than *de minimis*, even though no evidence was introduced tending to show the dollar value of the fuel consumed in the apartment buildings properly constituting the industry. However, I am not persuaded that it is common knowledge that a labor dispute in this industry would decrease the industry's demand for fuel. I should have thought it likely that all the landlords would rapidly make the minor adjustments necessary to operate the heating systems themselves; and that, if this were done, the industry's demand for fuel would not decrease. This view prevents me from attributing to Ricciardi's jury the knowledge necessary to resolve the first issue affirmatively; likewise I cannot join my brothers who believe it possible to take judicial notice of this fact.[6]

As I have pointed out, the majority assumes that in order for the Government to convict these defendants it was necessary that the Government prove a labor dispute in the Bronx apartment-house industry would, in fact, decrease the industry's demand for fuel; the majority sustains the convictions, despite a failure

of formal proof, because it concludes that formal proof of such an obvious fact is not required. I believe the convictions should be sustained on the ground that proof of effect is not required on a case-by-case basis in prosecutions commenced under 29 U.S.C. § 186(a) and (b). Persuasive authority for this position is found in several decisions construing Section 2(7) of the National Labor Relations Act, 29 U.S.C. § 152(7), which defines "affecting commerce" for purposes of that Act.[7]

In NLRB v. Reliance Fuel Oil Corp., 297 F.2d 94 (2 Cir. 1961), our court declined to enforce an order of the National Labor Relations Board asserting jurisdiction over Reliance Fuel Corporation, a company that sold fuel for heating purposes to New York State customers. Reliance did not make any significant out-of-state purchases, but Reliance did purchase in one calendar year fuel oil and related products valued at more than $650,000 from the Gulf Oil Corporation. Almost all of the products Reliance purchased from Gulf were refined outside of New York State and then shipped to Gulf's in-state storage facilities. Gulf in turn distributed the products to local storage tanks, one of which served the needs of Reliance. On this evidence we refused to enforce the Board's order. Our court said:

> * * * if the employer is himself engaged in interstate commerce, without more the jurisdiction of the Board is established. If the employer is not engaged in interstate commerce, the acts in question must lead or tend to lead to a dispute

6. United States v. Pecora, 267 F.2d 512 (3 Cir. 1959), the only case cited by the majority that arises under 29 U.S.C. § 186 and deals with the rule that well known facts need not be formally proved, is distinguishable. There is a world of difference between taking judicial notice of the proposition that "interstate highways affect interstate commerce," 267 F. 2d 512 at 515, and taking judicial notice that a janitors' strike in the Bronx would affect it to a demonstrable degree.

7. Section 2(7) of the National Labor Relations Act defines the term "affecting commerce" to mean "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 U.S.C. § 152(7).

which must burden or obstruct the free flow of interstate commerce. We believe that in enacting this double test Congress intended the courts to examine whether or not a labor dispute involving only employers not engaged in interstate commerce did or did not directly or indirectly burden or obstruct commerce. * * * 297 F.2d 94, at 99. Accordingly, our court remanded the case to the Board "with instructions to take further evidence and make further findings on the manner in which a labor dispute at Reliance affects or tends to affect commerce." Ibid. The Supreme Court in a brief *per curiam* opinion reversed the Second Circuit, NLRB v. Reliance Fuel Oil Corporation, 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963), stating that on the evidence of record the Board was justified in finding that "commerce" had been "affected." Id. at 227, 83 S.Ct. 312.

In view of the Supreme Court's opinion in NLRB v. Reliance Fuel Oil Corp., supra, it can be persuasively argued that a business not itself in interstate commerce nevertheless "affects" interstate commerce within the meaning of Section 2(7) of the National Labor Relations Act if the business makes substantial purchases of materials that have moved in interstate commerce, and that when evidence of substantial purchases of such materials has been introduced this effect has been conclusively established. See NLRB v. Cross, 346 F.2d 165 (4 Cir.), cert. denied, 86 S.Ct. 290 (1965). And if the requisite effect on interstate commerce of a business not itself in interstate commerce can be established for purposes of Section 2(7) merely by proving that the business purchases significant amounts of material that once moved in interstate commerce it seems to follow that effect should similarly be provable in criminal prosecutions commenced under 29 U.S.C. § 186(a) and (b) involving industries or activities not themselves in interstate commerce. This follows from the fact that the justification for the rule that effect need not be proved on a case-by-case basis is that there is an interest in the expeditious enforcement of federal labor policy, and from the further fact that this interest does not seem to be more worthy of consideration in unfair labor practice proceedings than it is in criminal prosecutions brought under Section 186(a) and (b). If the Supreme Court has ruled that effect may be established in unfair labor practice proceedings by proof of significant purchases of material that once moved in interstate commerce I cannot believe that it did not intend this rule also to apply in criminal proceedings brought to enforce federal labor policy. Therefore, I concur with my brothers in affirming the conviction below on the ground that the Government need not introduce evidence tending to prove that interstate commerce would be burdened by a labor dispute in an industry that is not "in commerce" but need only introduce evidence tending to show that the businesses which comprise the industry purchase significant amounts of material that once moved in interstate commerce.[8] Cf. NLRB v. Cross, supra.

8. It might be argued that this does not dispose of Unger's case since in that case the Government introduced no evidence tending to prove the dollar value of the fuel consumed in the approximately 5,500 apartment buildings in the Bronx and Westchester organized by Unger's union. However, as I suggest in the body of my concurring opinion, I am quite willing to take judicial notice that an industry defined to include so many businesses would purchase more than a *de minimis* amount of fuel.