**UNITED STATES of America,
Appellee,**

v.

**L. Joseph OVERTON et al., Defendants-
Appellants.**

**Nos. 290, 291, 292, Dockets 72–1730,
72–1767, 72–1768.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 2, 1972.

Decided Dec. 12, 1972.

Certiorari Denied March 26, 1973.
See 93 S.Ct. 1528.

Frederick P. Hafetz, New York City
(Moses L. Kove, New York City, on the
brief), for appellants Lawrence J. Over-
ton and Hulan E. Jack.

Samuel A. Neuburger, New York City
(Nathan H. Mitchell, New York City, on
the brief), for appellant L. Joseph Over-
ton.

Edward J. Kuriansky, Asst. U. S.
Atty. (Whitney North Seymour, Jr., U.
S. Atty., for the S. D. N. Y.; William
D. Gray and John W. Nields, Jr., Asst.
U. S. Attys., on the brief), for appellee.

Before LUMBARD, FEINBERG and
OAKES, Circuit Judges.

FEINBERG, Circuit Judge:

These appeals involve a scheme alleged
to violate 29 U.S.C. § 186, an enactment
intended to safeguard the integrity of
the collective bargaining process. Ap-
pellants L. Joseph Overton, his brother
Lawrence J. Overton, and Hulan Jack
were convicted after a two and one-half
week jury trial in the United States Dis-
trict Court for the Southern District of
New York, Sylvester J. Ryan, J., of con-
spiracy to violate section 186. 18 U.S.C.
§ 371. L. Joseph Overton was also con-
victed on nine counts which charged re-
ceipt of certain payments of money in

violation of that section; Hulan Jack was also convicted on nine counts which charged the aiding and abetting of substantive violations by the making of those payments. 18 U.S.C. § 2. On June 6, 1972, Judge Ryan sentenced L. Joseph Overton to a term of imprisonment for one year, six months to be served, six months suspended, followed by probation for three years; the judge also imposed a $10,000 fine. Hulan Jack was sentenced to three months in prison, with the balance of a one-year term suspended, and was fined $5,000.[1] Lawrence J. Overton was given a one-year suspended sentence and a $10,000 fine. Appellants individually and together raise a number of contentions on appeal. We find none of them persuasive, and affirm the judgments of conviction.

## I

The Government's evidence—which, where controverted, could be and apparently was believed by the jury—showed the following. The conspiracy, which ran from 1966 to late 1970, centered around the union influence of L. Joseph Overton, Business Agent for Harlem of Local 338, Retail, Wholesale Chain Store Food Employees Union, AFL–CIO ("Local 338"). Co-conspirator Lawrence Overton, brother of Joseph, was likewise active in the union, and during the period in question served periodically on its Welfare Board and on its Executive Board. Both men also played considerable roles in the formation and operation of Coordinated Community Services, Inc. ("CCS"), a principal tool of the conspiracy.

CCS was a private stock corporation formed in early 1966. The four original shareholders—each with 25 per cent of the stock—were Joseph Overton, Hulan Jack, Theodore Solomon, and Harry Rosenblum. Solomon was executive secretary of Associated Grocers of Harlem, Inc. ("AGH"), which represented 70 Harlem grocery stores and supermarkets and which negotiated and signed labor contracts with Joseph Overton and Local 338. Rosenblum was the owner of two grocery stores which were members of AGH and which adhered to the AGH–Local 338 labor contracts.[2] Shortly after organization of CCS, Joseph Overton purported to transfer his interest in CCS to another corporation, Emancipation March, Ltd., principally controlled by his brother Lawrence. The jury could find, however, as the Government urged, that this was merely an attempt at concealment and that Joseph Overton at all times remained a real CCS shareholder in interest. Once organized, CCS entered into contracts with six large and well-known food manufacturers. In return for fees from them which totalled as much as $80,000 per annum, CCS undertook to promote their products among the grocers and larger food retailers of Harlem. Promotional efforts were principally visits from Lawrence Overton, salaried as "Director of Operations" for CCS, and from his assistant in this capacity, Leonard Faust, brother-in-law of Joseph Overton.[3] Evidence disclosed that Joseph Overton intervened directly with a retailer on at least one occasion; so, too, did Hulan Jack. Jack, Faust, and Lawrence Overton were all known in the Harlem community, and their personal relationship and business affiliation with Joseph Overton were known generally by retailers with whom they dealt.

---

1. These sentences were imposed on Count One, the conspiracy count. On the remaining counts these appellants received identical sentences of one year suspended and three years probation, to run concurrently with sentences imposed on the conspiracy conviction.

2. Solomon and Rosenblum were convicted on the conspiracy count and on various counts charging substantive violations. Sentences of one year imprisonment, imposed upon each, were suspended. Rosenblum was fined $5,000; Solomon, $2,500. They do not appeal.

3. Faust was indicted and tried as a co-conspirator. The jury was unable to agree on his guilt, and a mistrial was declared.

The parties disagree as to how properly to characterize the corporate purpose of CCS. Appellant Jack testified that CCS operated simply as a public relations consultant, striving to improve the image of the products of its clients in the black community in Harlem. The Government, on the other hand, argues that the primary, if not sole, corporate purpose was to exploit the enormous union power of Joseph Overton to the pecuniary benefit of the corporate principals. Doubtless, the jury accepted the latter view. It is precisely this exploitation which the framers of section 186 viewed as inimical to constructive labor-management relations. Food retailers who employed union labor or employees who might seek representation by Local 338 could reasonably anticipate labor difficulties were they unwilling to purchase products of CCS clients. Once having agreed to patronize manufacturers represented by the Overtons through CCS, these retailers would probably expect fewer problems with the union. See United States v. Ryan, 225 F.2d 417, 426 (2d Cir. 1955) (L. Hand, J., dissenting), rev'd, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956) ("Congress wished to prevent employers from tampering with the loyalty of union officials, and disloyal union officials from levying tribute upon employers.") In short, the desire to make profits for CCS threatened to become the exclusive determinant of the adequacy with which employee interests were represented. That CCS offered a vehicle for subverting congressional purpose is thus clear. Whether the Government proved that appellants' conduct fell within the technical proscriptions of the statute, as charged in the indictment, is the principal question before us.

## II

■ Appellants argue that the Government's evidence was insufficient to prove elements of the conspiracy as alleged in the first count of the indictment. Section 186(b) of Title 29 makes it unlawful for any person to

request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) . . . .

Section 186(a) in turn prohibits the payment or delivery, by an employer or person acting "in the interest of an employer," of "any money or other thing of value"—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, *seeks to represent, or would admit to membership,* any of the employees of such employer . . . . [Emphasis added.]

Appellants concede that there was sufficient evidence of a violation of sections 186(b) and (a)(2); they admit that grocer-employers of clerks who *could be* represented by Local 338 were solicited for a "thing of value"—i. e., purchase of the products of clients represented by CCS. But, they contend, such a violation was not charged since the indictment specified only requests to and solicitations of employers whose employees were *already* members of the union, and thus only charged a conspiracy to violate 186(b) and (a)(1); because the Government proof did not establish requests to or demands of employers actually—as opposed to potentially—employing members of Local 338, there was no proof whatsoever of the crime charged.

■ To this, the United States makes a two-fold reply: Appellants have simply misread the indictment; and even under their erroneously narrow reading, there was sufficient evidence to prove the charge. The second argument is clearly correct. It must be remembered that the crime alleged was conspiracy— an unlawful agreement to solicit contracts from grocer-employers of members of the local. Even if no actual solicitation of grocer-employers was established, proof of an agreement to solicit would alone suffice. Here the Govern-

ment introduced a CCS memorandum for a client which outlined specific programs designed to solidify CCS good will among store clerks: These included "special nights honoring members of the retail union" and occasions on which CCS would host "membership meetings of the union, serving the products of our sponsor." A letter to a second client stated that:

> A sustained campaign is waged by CCS to increase the demand . . . by soliciting the cooperation of the stores . . . on behalf of the products we sponsor. In addition, CCS has a good working relationship with the clerks.

We think this language, taken in context, is adequate to warrant the inference that the clerks and union members referred to were employees of the grocers solicited. The further inference—that solicitation of grocers actually employing Local 338 members was a primary purpose of the conspiracy—seems also justified.

■ On this view, it is unnecessary to deal at length with appellants' claim that the indictment did not also charge a conspiracy to violate subsection (a)(2) of section 186. We conclude that it did, as set forth in a footnote below.[4]

### III

Appellants Joseph Overton and Jack assert that the legal theory under which the various substantive violations went to the jury was erroneous as a matter of law and misinterprets the purpose of the statute. This theory—wholly different from the one which supported the conspiracy count—assumes that payments in the form of CCS checks, signed by defendants Rosenblum and Solomon (aided and abetted by appellant Jack), made to appellant Joseph Overton gave rise to criminal liability under the prohibition of section 186. Appellant Jack's violations were in aiding and abetting these payments; appellant Joseph Overton's were in receiving them. In two somewhat related ways, appellants argue that these payments did not violate 29 U.S.C. § 186.

■■ Appellants claim that the payments by Rosenblum and Solomon, who were concededly employers of grocery clerks, were made not on their own behalf, but for their corporation, Coordinated Community Services, Inc.; that CCS was not itself an employer as required by section 186; and that although the jury could properly convict if it found that CCS was acting "in the interest" of employers Rosenblum and Solomon when the payments were made, this theory was never submitted to the jury. The argument is without merit. The jury was adequately charged that it had to find that Rosenblum and Solomon were employers, that on specified dates of payments to Joseph Overton, Rosenblum and Solomon were employers or acting in the interest of employers, and that the checks were made and delivered by Rosenblum and Solomon and received by Joseph Overton. This was sufficient. Payments by these employers, though made through a non-employer corporate instrumentality, are nevertheless within the prohibition of the statute. Cf. United States v. Ferrara, 458 F.2d 868 (2d Cir. 1972), and United States v. Iozzi, 420 F.2d 512 (4th Cir. 1970), cert. denied, 402 U.S. 943, 91 S.Ct. 1607, 29 L. Ed.2d 111 (1971), affirming convictions for payments made to labor representatives by a non-employer business entity where a principal thereof owned or con-

---

4. Appellants argue that paragraph 2 of Count One, which refers in terms only to section 186(a)(1), is the sole definition of the conspiracy grounded squarely on the language of the statute. They regard paragraph 3, which tracks the language of 186(a)(2), as mere amplification of Joseph Overton's role in the conspiracy. A fair reading of the first count, however, reveals that paragraphs 2 and 3, following generalized allegations of conspiracy in paragraph 1, together point up the dual objective of the conspirators, and both serve to link the conspiracy to the two statutory subsections equally implicated. Just as clearly, Joseph Overton's role is more fully set out, not in paragraph 3 at all, but in paragraph 4.

trolled or was a key officer of another corporation which was an employer. The Supreme Court has characterized section 186 as "a criminal provision . . . which outlaws *all* payments, with stated exceptions [not here relevant] between employer and representative." United States v. Ryan, 350 U.S. 299, 305, 76 S.Ct. 400, 404, 100 L.Ed. 335 (1956) (emphasis added). We see no reason why in this case the corporate scheme devised by these defendants insulated them from criminal liability.

■ Similar reasoning leads us to reject a parallel contention that because the payments in question were merely internal distributions of profits, they cannot serve as a predicate for conviction. Appellants rely on dictum to this effect in United States v. Lippi, 190 F. Supp. 604 (D.Del.1961). Whatever may be the persuasiveness of the reasoning in *Lippi,* which appears to ignore the literal language of the statute, we find that decision inapposite to the facts here. *Lippi* involved a dividend distribution by an operating *coal company* to its shareholders, one of whom was an officer of the United Mine Workers Local representing the company's employees. Though the CCS payments to Overton can also be labelled "dividends," they stand on rather different footing. Unlike *Lippi,* a union official here became a shareholder of the corporation whose very purpose, the jury could find, was to exploit his own union power.

## IV

Appellants contend that the trial judge deprived them of a fair trial when he admitted testimony concerning a labor dispute fomented by Joseph Overton with the Harlem River Consumers Cooperative for the purpose of coercing it to buy products promoted by CCS. Interference with interstate commerce by threats or violence is a felony, punishable by imprisonment for up to 20 years, under a separate provision of the United States Code, 18 U.S.C. § 1951 (the

Hobbs Act). Appellants argue that this evidence was irrelevant to the lesser crime here charged, was beyond the scope of the indictment, and was unduly prejudicial. We find these arguments unpersuasive.

■ Evidence of coercive behavior, punishable under the Hobbs Act, is competent and relevant to prove a conspiracy to violate section 186, which contemplates a "situation where an employee representative might resort to pressure to obtain payment by conduct that may be characterized as coercive." United States v. Kramer, 355 F.2d 891, 896, (7th Cir.), cert. denied, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396 (1966);[5] see Arroyo v. United States, 359 U.S. 419, 425–426 (1959); cf. United States v. Ryan, 232 F.2d 481, 483 (2d Cir. 1956). Joseph Overton's threats against the "Harlem Co-op" were part and parcel of the conspiracy to request and demand things of value from employers whose employees Local 338 sought to represent. See note 4 supra and accompanying text. Whether or not Lawrence Overton and Hulan Jack knew of the precise methods chosen by Joseph Overton to secure the cooperation of given employers, they are responsible as conspirators for acts taken by a co-conspirator to further the purposes of their agreement, see, e. g., Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); evidence of such methods is surely relevant even as to unknowing co-conspirators. Moreover, any assertion that proof of Joseph Overton's coercive threats was properly excludible as beyond the scope of the indictment is legally unsound. Cf. Korholz v. United States, 269 F.2d 897, 901 (10th Cir. 1959), cert. denied, 361 U.S. 929, 80 S. Ct. 367, 4 L.Ed.2d 352 (1960); United States v. McMaster, 343 F.2d 176, 181 (6th Cir.), cert. denied, 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.2d 65 (1965). Such an assertion is factually erroneous as well —the indictment specified as an overt act a meeting between Joseph Overton

---

5. Certiorari was granted in part on an issue not relevant here.

and Cora Walker, a founder of the Co-op. Finally, there is the claim that the evidence was "prejudicial." Of course it was, in the sense that it helped the Government's case. But we have already held the evidence admissible; appellants argue that it should have been excluded because overtones of other crimes or sympathy for the Co-op might arouse hostility toward them. Whether such a ruling would have been correct on this record is doubtful; from appellants' point of view, at best this was a matter for the judge's discretion. In other rulings, the judge did not hesitate to exercise his power and protect defendants' rights when he thought it appropriate.[6] His failure to exclude this evidence must have reflected a judgment—which we share—that its admission could not fairly be regarded as denying defendants a fair trial.

### V

■ Appellant Jack requested that Judge Ryan charge the jury on the element of wilfulness as follows:

> The term "wilfully violates" in section 186(d) contemplates proof of an awareness of the restrictions of that section or a reckless disregard for that section.

The requested charge is squarely based on language in United States v. Inciso, 292 F.2d 374, 380 (7th Cir. 1961). Without regard to whether *Inciso* may have been subsequently modified by the Seventh Circuit itself, see United States v. Keegan, 331 F.2d 257, 261–62 (7th Cir.), cert. denied, 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964), the requested charge was properly rejected. In United States v. Ricciardi, 357 F.2d 91, 100 (2d Cir.), cert. denied, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966), an appellant called attention to *Inciso* [7] and made precisely the same argument urged here. Nonetheless, we affirmed the lower

court's refusal to give a charge substantially identical to the one requested by Jack; we reaffirm the validity of *Ricciardi*.

Appellant L. Joseph Overton raises several further claims. He argues that the trial judge erroneously denied his request for a nonjury trial; that empanelling an alternate juror after he had been placed in jeopardy was improper; and that the delay between indictment and trial exceeded what is permissible under our Rules Regarding Prompt Disposition of Criminal Cases. We have carefully considered these claims but have concluded that no reversible error was committed.

Judgments affirmed.

---

6. Judge Ryan severed trial on two counts which charged Hulan Jack and Joseph Overton with perjury on the ground that it would deprive defendants Rosenblum and Solomon of a fair trial. Further, the judge refused to allow the United States to prove these false statements as circumstantial evidence of guilty consciousness.

7. Brief for Appellant Unger 39–40.