**PARI MUTUEL CLERKS UNION OF LOUISIANA, LOCAL 328 affiliated with the Service Employees International Union, AFL–CIO, Plaintiff-Appellant,**

v.

**FAIR GROUNDS CORPORATION, Defendant-Appellee.**

No. 82–3259.

United States Court of Appeals, Fifth Circuit.

April 25, 1983.

---

Barker, Boudreaux, Lamy, Gardner & Foley, Marie Healey, New Orleans, La., for plaintiff-appellant.

Baldwin & Haspel, H. Sloan McCloskey, New Orleans, La., for defendant-appellee.

Before GOLDBERG, GEE and RANDALL, Circuit Judges.

GOLDBERG, Circuit Judge:

This is a jurisdictional claiming race with a novel twist: no forum has come forward to claim the cause of action. Appellant Pari-Mutuel Clerks Union of Louisiana Local 328 ("Union"), seeking to enforce certain arbitration awards, filed suit against

appellee Fair Grounds Corp. ("Fair Grounds") under section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (1976). The district court observed that the National Labor Relations Board ("NLRB") has declined to exercise its discretionary jurisdiction over the horseracing industry, *see id.* § 14(c)(1), 29 U.S.C. § 164(c)(1) (1976); 29 C.F.R. § 103.3 (1982). Persuaded that it should defer to the NLRB's expertise, the district court refused to exercise its own jurisdiction over the action and granted summary judgment for Fair Grounds. The Union, jockeying for a federal forum, now appeals. We reverse and remand.

## I. AND THEY'RE OFF . . . .

### A. Facts

The Union is an unincorporated labor organization serving as the recognized collective bargaining representative for a unit of employees at the Fair Grounds Race Track ("Race Track"), a racing enterprise operated by appellee Fair Grounds. Union members sell and cash betting tickets at the Race Track and operate the equipment that tabulates and calculates the bets placed.

The Race Track is open for horseracing and betting for up to 105 days per year. The facility is nationally known, and it draws patrons from across the United States and around the world. Ticket sales average over $1 million per day of track operation.

The horses that run at the Race Track are raised and bred in Arkansas, Florida, Illinois, Kentucky, Louisiana, Maryland, New Jersey, New York, and Ohio. The Race Track pays approximately $10 million per year in prize money to horse owners in these various states. Similarly, many of the jockeys who ride at the Race Track reside in states other than Louisiana. In addition, horses and jockeys who appear at the Race Track also appear at race tracks in other states at different times throughout the racing season.

Fair Grounds operates twenty-six concession stands and bars at the Race Track, which sell hot dogs, hamburgers, popcorn, cigarettes, soft drinks, and liquor, as well as a full-service restaurant. Fair Grounds leases its racing equipment from American Totalisator Co. ("Amtote"), a Maryland corporation. Amtote leases similar equipment to other race tracks across the country where pari-mutuel betting is permitted. The Amtote equipment is transferred from track to track as they open and close.

The Union and Fair Grounds are parties to a collective bargaining agreement governing the wages, hours, and working conditions of Union members. The agreement creates an elaborate grievance and arbitration procedure, pursuant to which a special arbitration committee has been established. On April 6, 1981, the arbitration committee rendered awards on behalf of two Union members. Fair Grounds refused to comply with the awards, and this litigation followed.

### B. Proceedings Below

The gun sounded in this litigation on August 19, 1981. The Union was first out of the gate, filing its complaint against Fair Grounds in the United States District Court for the Eastern District of Louisiana. The complaint sought to enforce two arbitration awards under section 301(a) of the LMRA, 29 U.S.C. § 185(a) (1976). Fair Grounds, coming up on the outside, filed its motion for summary judgment on January 8, 1982. Following oral argument on the motion, the district court noted that the NLRB has declined to exercise its discretionary jurisdiction over the horseracing industry. The court then determined that it "should defer to the expertise of the [NLRB] and hold that horseracing is an industry of essentially local concern." Record on Appeal, Vol. II at 11. Consequently, the court granted summary judgment in favor of Fair Grounds and dismissed the Union's action. Having lost the first half of the jurisdictional daily double, the Union now appeals to this court.

## II. INTO THE FIRST TURN: ISSUES ON APPEAL

Following the lead of the NLRB, which has declined to assert jurisdiction over the

horseracing industry pursuant to the statutory authority granted by LMRA § 14(c)(1), 29 U.S.C. § 164(c)(1) (1976), the district court refused to take jurisdiction of the Union's cause of action against Fair Grounds. On appeal, the Union urges that the district court erred in dismissing its cause of action. In particular, the Union argues that federal courts must exercise the statutory jurisdictional authority granted by section 301(a) of the LMRA, 29 U.S.C. § 185(a) (1976), when the requirements of that statute are met. The Union further asserts that the district court should not have deferred to the NLRB's decision declining jurisdiction over the horseracing industry. Finally, the Union claims that horseracing is an "industry affecting commerce" within the meaning of section 301(a). We now turn to an appraisal of these arguments.

## III. INTO THE STRETCH

### A. The Back Stretch: The District Court's Jurisdiction

Section 301(a) of the LMRA, which gives the federal courts jurisdiction over disputes involving collective bargaining agreements, is the starting gate for our discussion. That section provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having juris-

diction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. LMRA § 301(a), 29 U.S.C. § 185(a) (1976) (emphasis added). "The term 'industry affecting commerce' means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce." Id. § 501(1), 29 U.S.C. § 142(1) (1976).

The jurisdiction of the NLRB is differently circumscribed. Under the National Labor Relations Act ("NLRA") § 10(a), 29 U.S.C. 160(a) (1976), the NLRB "is empowered ... to prevent any person from engaging in any unfair labor practice ... affecting commerce" (emphasis added). Section 2(7) of the NLRA, 29 U.S.C. § 152(7) (1976), defines "affecting commerce" as "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

In its discretion, the NLRB may decline to exercise its jurisdiction where it has determined that "the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." LMRA § 14(c)(1), 29 U.S.C. § 164(c)(1) (1976) (emphasis added). Pursuant to this statutory authority, the NLRB has consistently declined to exercise its jurisdiction with regard to the horseracing and dogracing industries.[1] As a reflection of

---

1. For the first fifteen years of its existence, the NLRB determined on a case by case basis whether or not to assume jurisdiction in a particular dispute. In 1950, this practice was replaced with a series of standards to determine whether the NLRB would assume jurisdiction over a specific industry. *San Juan Racing Ass'n v. Labor Relations Bd.*, 532 F.Supp. 51, 53 (D.P.R.1982). Basically, the NLRB limited its jurisdiction by setting certain minimum dollar volumes of business and exempting certain "essentially local" businesses. During this period the NLRB declined to assert jurisdiction over horseracing and dogracing and related industries. *See IBEW Local 1501 v. American Totalisator Co.*, 529 F.Supp. 419, 420 (D.Md. 1982); *Los Angeles Turf Club, Inc.*, 26 L.R.R.M. (BNA) 1145 (1950).

In 1957 and 1958 the Supreme Court held that the NLRB could not refuse to exercise jurisdiction over entire classes of employers. *See Hotel Employees Local 255 v. Leedom*, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958); *Office Employers Int'l Union Local 11 v. NLRB*, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957). Congress then amended the National Labor Relations Act to codify the NLRB's authority to continue to decline jurisdiction, enacting what is now 29 U.S.C. § 164(c)(1). *See* Pub.L. No. 86–257, § 701(a), 73 Stat. 519, 541 (1959). Since 1959 the NLRB has continued its refusal to take jurisdiction over labor disputes arising in the horseracing and dogracing industries. *See, e.g., Yonkers Raceway, Inc.*, 79 L.R. R.M. (BNA) 1697 (1972); *Walter A. Kelley*, 51

this general policy, the NLRB has adopted a rule stating that it "will not assert its jurisdiction in any proceeding under section 8, 9, and 10 of the [NLRA] involving the horseracing and dograced industries." 29 C.F.R. § 103.3 (1982).[2] As a result, all racing industry employees are scratched from entry into the NLRB's field.

In the instant case, the district court yielded to the NLRB's expertise and accepted the view that horseracing is an industry of essentially local concern. Because the parties to the litigation are engaged in horseracing, the district court determined that it did not have jurisdiction to entertain this action and granted summary judgment for Fair Grounds. The Union now urges that this dismissal was in error, contending that the cause of action clearly was within the court's jurisdiction under section 301(a) of the LMRA, 29 U.S.C. § 185(a) (1976), and that the court acted improperly in deferring to the NLRB. We agree with the Union's position.

■■■ The LMRA establishes two primary mechanisms for promoting the goal of industrial stability: private enforcement of collective bargaining agreements through section 301 and government sanctions for unfair labor practices through the NLRB. *See American Totalisator,* 529 F.Supp. at 421. These mechanisms are merely alternative routes to the same destination—the goal of peaceful resolution of labor-related matters. These alternate routes are inde-pendent means for achieving the same end, but they are not mutually exclusive. *See id.* at 422. For example, federal courts have jurisdiction under LMRA section 301 to resolve disputes involving alleged breaches of collective bargaining agreements, even though the breach may also constitute an unfair labor practice. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976). The existence of a remedy before the NLRB does not bar a suit for damages for breach of a collective bargaining agreement in the federal courts under section 301. *Carey v. Westinghouse,* 375 U.S. 261, 268, 84 S.Ct. 401, 407, 11 L.Ed.2d 320 (1964); *Carpenters Local 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489, 517 (1982); *International Union v. E-Systems, Inc.,* 632 F.2d 487, 490 (5th Cir. 1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1979, 68 L.Ed.2d 298 (1981). Thus, it has been held that the preemption doctrine,[3] which requires that federal courts defer to the exclusive competence of the NLRB, is "not relevant" to actions brought under section 301 of the LMRA. *Local 174 Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 101 n. 9, 82 S.Ct. 571, 575 n. 9, 7 L.Ed.2d 593 (1962). When a challenged activity constitutes a breach of a collective bargaining agreement, the NLRB's authority "is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301." *Smith v. Evening News Association,* 371 U.S. 195, 197, 83 S.Ct. 267, 268, 9 L.Ed.2d

---

L.R.R.M. (BNA) 1375 (1962); *Hialeah Race Course, Inc.,* 45 L.R.R.M. (BNA) 1106 (1959).

**2.** The NLRB's rationale for declining to assert jurisdiction over the racing industry is that racing operations are so essentially local in character that a labor dispute therein would be unlikely to disrupt interstate commerce. The NLRB views regulation of racing industry labor matters as an area best left to the states, because race tracks are subject to detailed state regulation that could be extended to include labor relations. *See San Juan Racing Ass'n,* 532 F.Supp. at 54; *Independent Ass'n of Pari-Mutuel Employees v. Gulfstream Park Racing Ass'n,* 407 F.Supp. 855, 856 (S.D.Fla.1976).

We note that one court recently has held that, in promulgating Rule 103.3, 29 C.F.R. § 103.3 (1982), the NLRB failed to conduct the requisite inquiry into the volume of commerce affected by labor disputes in the racing industry. *New York Racing Ass'n v. NLRB,* 110 L.R.R.M. (BNA) 3177, 3183 (E.D.N.Y.1982). The NLRB's decision declining jurisdiction over the New York Racing Association was remanded for reconsideration. *Id.* at 3183.

**3.** When an activity arguably falls within section 7 (right to organize and bargain collectively) or section 8 (unfair labor practices) of the National Labor Relations Act, 29 U.S.C. §§ 157, 158 (1976), the preemption doctrine teaches that ordinarily "the states as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959).

246 (1962). In enacting section 301, Congress intended to provide the parties to a labor contract with an independent forum as an alternative to government enforcement by the NLRB. *See Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 508–513, 82 S.Ct. 519, 523–525, 7 L.Ed.2d 483 (1962). Consequently, a party seeking to enforce a collective bargaining agreement has a choice of forums: the courts or the NLRB.

Thus, when breach of a collective bargaining agreement constitutes an unfair labor practice, the courts' jurisdiction to entertain the dispute overlaps the jurisdiction of the NLRB. It does not follow, however, that the jurisdictions of these two enforcement schemes are congruent. As noted earlier, the key phrase in Congress' grants of jurisdiction to both the courts and the NLRB is "affecting commerce." The courts' jurisdiction covers suits for "violations of contracts . . . in an industry affecting commerce." LMRA § 301(a), 29 U.S.C. § 185(a) (1976). The jurisdiction of the NLRB extends to "unfair labor practices . . . affecting commerce." NLRA § 10(a), 29 U.S.C. § 160(a) (1976). Significantly, the NLRB also has discretion to decline to exercise its jurisdiction if it determines that a particular dispute does not have a "sufficiently substantial" effect on commerce. LMRA § 14(c)(1), 29 U.S.C. § 164(c)(1) (1976). As the *American Totalisator* court noted:

> Equating a court's jurisdiction with the permissible outer limits of NLRB jurisdiction is justified since the outer limits of the agency's jurisdiction and of the court's jurisdiction coincide. Equating a court's jurisdiction with the permissible discretionary exercise of NLRB jurisdiction is not justified under the statute. This is not an instance of a court's deferring to an agency's interpretation of an imprecisely defined statute. *The NLRB is specifically empowered to exercise less*

> *than its authorized jurisdiction; this Court is not.*

529 F.Supp. at 421 (emphasis added).

 We hold, therefore, that a federal district court has jurisdiction under LMRA § 301(a), 29 U.S.C. § 185(a) (1976), to entertain an action for breach of a collective bargaining agreement, even if the dispute involves an industry over which the NLRB has declined to exercise jurisdiction. Because a federal court's jurisdiction over such matters is independent of that of the NLRB, it is unaffected by the NLRB's decision to decline jurisdiction. So long as the statutory requirements of section 301 are satisfied,[4] a federal court must exercise the authority granted by that section to hear labor contract disputes. *See Fellows v. Universal Restaurants, Inc.,* 701 F.2d 447, 449 (5th Cir.1983). This result is entirely consistent with the strong Congressional policy, reflected in section 301, favoring judicial enforcement of collective bargaining contracts. As the history of section 301 reflects, "Congress deliberately chose to leave the enforcement of collective agreements 'to the usual processes of law.'" *Dowd Box,* 368 U.S. at 513, 82 S.Ct. at 525. The door to the federal courthouse swings quite wide, and we will not slam it in a litigant's face unless the statute itself mandates such a result. *Accord, American Totalisator,* 529 F.Supp. at 422; *see also Stein v. Mutual Clerks' Guild,* 560 F.2d 486, 490 (1st Cir.1977) (NLRB's declination of jurisdiction over horseracing industry does not bar suit under sections 3 and 102 of Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 402, 412 (1976)). *Contra, San Juan Racing Association v. Labor Relations Board,* 532 F.Supp. 51 (D.P.R.1982) (deferring to NLRB's position and dismissing cause of action under LMRA § 301); *Independent Association of Pari-Mutuel Employees v. Gulfstream Park Racing Association,* 407 F.Supp. 855 (S.D.Fla.1976) (same).

Appellee Fair Grounds cites *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87

---

4. As this court has noted, "[a] section 301 claim must satisfy three requirements: (1) a claim of violation of (2) a contract (3) between an employer and a labor organization." *Pratt-* *Farnsworth,* 690 F.2d at 500. To these three requirements we would add a fourth: the dispute must concern an "industry affecting commerce" as defined in 29 U.S.C. § 142(1) (1976).

L.Ed. 1424 (1943), for the proposition that a federal court should defer to state court adjudication of certain matters in order to avoid needless conflict with the administration by a state of its own affairs. Fair Grounds contends that the Louisiana state courts provide the appropriate forum for resolution of labor disputes in the horseracing industry, because Louisiana has a large financial stake in the industry and regulates it extensively. Accordingly, Fair Grounds asserts that the district court's dismissal of the Union's cause of action was appropriate as an equitable deferral to the Louisiana state courts.

■■■ We believe Fair Grounds' reliance on *Burford* to be misplaced, for *Burford* involved concerns of federal-state comity not presented in the case at bar. Although Louisiana regulates extensively the operations of the horseracing industry, *see* La. Rev.Stat.Ann. §§ 141–197 (West Supp. 1983), this state regulation does not encompass labor relations in that industry. Because Louisiana has no legislation governing labor relations in the horseracing industry, a party seeking to enforce a collective bargaining agreement in a Louisiana state court would have to rely upon section 301(a) of the LMRA as support for a cause of action.[5] An action brought under section 301 is controlled by federal substantive labor law even if it is brought in state court. *Humphrey v. Moore,* 375 U.S. 335, 343–44, 84 S.Ct. 363, 368–369, 11 L.Ed.2d 370 (1964); *Smith v. Evening News Ass'n,* 371 U.S. at 199, 83 S.Ct. at 269; *Lucas Flour,* 369 U.S. at 102–103, 82 S.Ct. at 576–577. Thus, even if the Union had filed this section 301 action in Louisiana state court, as Fair Grounds suggests, the Louisiana court would have been bound to apply the principles of feder-

al labor law created by the federal courts in the wake of *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). It would be inane and illogical to require the federal district court in this case to defer to state court resolution of a labor dispute, when the federal law of labor relations would control the state adjudication. No questions of comity or undue interference with state affairs, such as that presented in *Burford,* exist here, and we reject Fair Grounds' contention that the district court's dismissal of the Union's cause of action was an appropriate deferral to the state courts.

To summarize, we hold that a federal district court's jurisdiction over contractual labor disputes under section 301(a) of the LMRA is independent of the NLRB's authority to entertain disputes involving unfair labor practices. Accordingly, the NLRB's decision to decline to exercise its jurisdiction over the racing industry in no way limits a federal court's authority to hear a dispute arising from that industry, so long as the statutory requirements of section 301(a) are met. Furthermore, no principles of comity or federalism required the federal court in this case to defer to state court adjudication of the controversy. Thus, we hold that the district court's deferral to the NLRB's decision to decline jurisdiction was improper. There remains, then, only one issue in this case: is horseracing an "industry affecting commerce" within the meaning of sections 301 and 501 of the LMRA?[6]

### B. The Home Stretch: Is Horseracing an "Industry Affecting Commerce"?

■■■ Section 501(1) of the LMRA, 29 U.S.C. § 142(1) (1976), defines the term "in-

---

**5.** It is a well-established principle that section 301 grants to both federal and state courts the jurisdiction to entertain disputes involving collective bargaining agreements. *Amalgamated Ass'n of Street Employees v. Lockridge,* 403 U.S. 274, 298, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971); *Smith v. Evening News Ass'n,* 371 U.S. at 197–98, 83 S.Ct. at 268–269; *Lucas Flour,* 369 U.S. at 101, 82 S.Ct. at 575; *Dowd Box,* 368 U.S. at 507–513, 82 S.Ct. at 522–525.

**6.** Under our holding today, the only constraints upon a federal court's jurisdiction over disputes involving collective bargaining agreements are those found in § 301(a) itself. *See supra* note 4. The parties agree that the instant case involves a claim of violation of a contract between an employer and a labor organization; thus, three of the § 301(a) requirements are clearly satisfied. The only question, therefore, concerns the "industry affecting commerce" aspect of the § 301(a) test.

dustry affecting commerce" as "any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce." The Race Track attracts patrons, horses, and jockeys from many states across the country. Ticket sales average $1 million per day when the track is in operation, and the track pays over $10 million per year in prizes. This money flows from out-of-state patrons to Fair Grounds and then back to out-of-state horseowners. Fair Grounds operates a number of food service facilities at the Race Track, which sell food products presumably produced, processed, and manufactured outside Louisiana. Essential racing equipment is leased from a Maryland corporation and imported into Louisiana from other states. These undisputed facts reveal that many out-of-state patrons transport themselves across state lines to the Fair Grounds Race Track to find their fortunes reported on the likewise imported totalisator. Despite this factual record, which is admitted by Fair Grounds, the district court determined that it "should defer to the expertise of the [NLRB]" and found that "horseracing is an industry of essentially local concern." Record on Appeal, Vol. II at 11. To the extent that this finding reflects the district court's determination that the horseracing industry does not "affect commerce," our review of the record leaves us with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Clearly Fair Grounds and the Union are engaged in an "industry affecting commerce," and the district court's finding to the contrary must be regarded as clearly erroneous. *See New York Racing Association v. NLRB,* 110 L.R.R.M. (BNA) 3177, 3183 (E.D.N.Y.1982) (noting "overwhelming impact" of horseracing industry on commerce and observing that NLRB regulates industries with far less impact on commerce). Because all the requirements of section 301(a) were satisfied, the district court erred in granting summary judgment for Fair Grounds.

## IV. AT THE WIRE

Historically, a litigant has had two possible tracks available in the race for harmonious labor relations: the NLRB as Track # 1 or the United States District Court as Track # 2. Here the NLRB has denied entry to its track, refusing to hear any matters concerning employees at any racetrack. With only one possible track remaining available, that being the United States District Court, the pari-mutuel clerks in this case sought entry into such court and were summarily scratched from entering the race. We do not have before us any question regarding Track # 1, and we have no intention of disturbing the wisdom and judgment of the National Labor Relations Board. We *do* have before us the task of examining the law regarding entry into Track # 2—the United States District Court—for the solution of this labor management problem. While it may be argued that the juridical apertures of the federal courts are very narrow ones, it is also indisputable that once an aperture becomes available it cannot be denied merely because the case is distasteful or difficult. Once jurisdiction is created it is rarely optional. In the case before us, there is no option to be exercised by the district court; this is a case under a statute that plainly places arbitration of collective bargaining agreements within its jurisdictional ambit. Thus, this jurisdictional run for the roses concludes with appellant Union occupying the winner's circle. Having determined that the district court erred in deferring to the NLRB's decision to decline jurisdiction over the horseracing industry and that horseracing is an "industry affecting commerce" within the intendment of the LMRA, we hold that the district court's grant of summary judgment in favor of Fair Grounds was in error. Accordingly, we reverse the district court and remand this cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED.