**WABASH PUBLISHING COMPANY, Plaintiff,**

v.

**Martin DERMER, Defendant.**

**No. 84 C 6766.**

United States District Court, N.D. Illinois, E.D.

May 9, 1986.

Anthony R. Chiara, Hill, Van Santen, Steadman & Simpson, P.C., Chicago, Ill., for plaintiff.

Wayne H. Michaels, Hamman & Benn, Chicago, Ill., for defendant.

**1.** Throughout this opinion, "plaintiff" refers to plaintiff and counterdefendant Wabash Publishing and "defendant" refers to defendant and counterplaintiff Martin Dermer.

**2.** 29 U.S.C. § 186(a) states:

It shall be unlawful for any employer or association of employers or any person who acts as labor relations expert, advisor, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

This suit involves rival publishers of betting tip sheets at Chicago area racetracks. Plaintiff, Wabash Publishing Company, filed suit alleging infringement of its registered trademark "Streamliner's Turf Journal." Defendant counterclaimed, alleging trademark infringement, unfair competition, and violations of the antitrust laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Presently before the Court are plaintiff's motions for summary judgment upon defendant's RICO counterclaim and to compel discovery.[1]

*Motion for Partial Summary Judgment*

Count IX of defendant's counterclaim alleges a RICO violation. The predicate acts of racketeering activity upon which the count is premised are alleged infractions of Section 302(a)(4) of the Labor-Management Relations Act (as amended), 29 U.S.C. § 186(a)(4).[2] The alleged infractions involve payments to the union stewards for Teamsters Truck Drivers and Helpers Union, Local 706, whose members operate the vending stands at Chicago area racetracks. Defendant alleges plaintiff gave the stewards cash payments and extra copies of its publication in order to influence them to encourage the union venders to promote the sale of plaintiff's publications and discourage the sale of defendant's competing

of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

publications. Plaintiff, through the affidavit of its President, Thomas J. Kelly, Sr., admits that, over a 25 year period, it has given semi-annual "cash bonuses" to the vendors at the racetracks, who may have included the union stewards. However, plaintiff denies that such bonuses were ever intended to influence the stewards in their duties as union officials.

Plaintiff contends that liability under Section 302(a) requires proof that "(1) an Employer paid money (2) to a Union representative with the (3) Intent to influence him in his control over members of the Union *working for the employer*." Plaintiff's memorandum in support at 2 (emphasis supplied). Plaintiff maintains that the union vendors were never Wabash Publishing employees. Thus, under plaintiff's formulation of Section 302(a), the plaintiff could not be liable for any payments made to the union stewards. Defendant disputes plaintiff's contention that the vendors were never Wabash employees. *See*, affidavits of Joseph Harris and Martin Dermer. However, the Court need not address the sufficiency of those affidavits since it disagrees with the plaintiff's formulation of the prerequisites for liability under Section 302(a).

Plaintiff's argument that liability under Section 302(a)(4) must be predicated upon the transfer of money or some other valuable thing from an employer to a representative of *that employer's employees* is not supported by the plain language of the statute, the legislative history of the amendments to Section 302 enacted as part of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), or case law.

Prior to its amendment by the LMDRA, Section 302(a), which was originally enacted as part of the Labor Management Relations Act of 1947, read as follows:

It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

This proscription is now embodied in Subsection (a)(1). Subsections (a)(2), (3), and (4), added by the LMRDA, were intended to supplement that proscription and close loopholes in its coverage.[3] As defendant notes, subsection (a)(4), by its terms and in contrast to subsection (a)(1), does not require the employees involved to be employees of the employer involved. Conversely, subsection (a)(4) does require that any payment be made "with intent to influence," a requirement absent from subsection (a)(1). Plaintiff's formulation attempts to combine the restrictive aspects of each subsection to create a restrictive reading of Section 302(a) that is simply not supported by that section's language.

Nor is that reading supported by the legislative history of the LMRDA. The revision of subsection 302(a) enacted by that Act originated in the Senate. Subsection (a)(4), as embodied in the Senate bill, was accepted without change by the House. *See*, 2 National Labor Relations Board, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959*, at 1894–95 (1959) (hereinafter cited as *Legislative History*). The Senate Report on the bill, as reported by the Committee on Labor and Public Welfare, states:

Section 111: Amends sections 302(a), (b), and (c) of the Labor Management Relations Act, 1947, as amended, primarily for the purpose of clarifying an ambiguity which presently exists. Under present law it is illegal for an employer to pay or deliver anything of value to a representative of his employees. The amendments contained in this section would remove any doubt that *all* forms of bribery and extortion which might escape the provisions of existing law would be prohibited under pain of criminal penalties for conviction thereof. The intent of these amendments to sections 302(a) and (b) is to forbid any payment or bribe by an employer of [sic] anyone who acts in the interest of an employer whether

---

**3.** *See*, discussion of the legislative history of the LMRDA, *infra*.

technically an agent or not and to forbid the receipt of any such bribe by any person, whether an individual, an officer or employee of a labor organization or a committee representing employees. Payment to and receipt of such payments by any union officer or employee having the intent of influencing such officer or employee in respect to *any* of his actions, decisions, or duties as a representative of employees or as such union officer or employee would also be made a criminal offense.

*Id.* at 439 (emphasis supplied). The minority report also makes it clear that those Senators had no doubt concerning the extensive reach of subsection (a)(4):

This section also makes it a crime for an employer to give or lend anything of value to an officer or employee of a union with intent to influence his decisions, actions or duties as a "representative of employees" (again that dangerous phrase) or as a union "officer or employee." If this were merely intended to outlaw bribery of union officials, that is already illegal under all State laws. But the term "influence" includes acts which are not technically bribery—what seems to be aimed at is prohibiting the subversion of union officials in the performance of their union duties. But why should such subversion be criminal only if it is committed by an employer, even if the employer and the subverted official's union have absolutely no relations with each other? (The bill's language includes such a situation in its scope). If the subversion of union officials is reprehensible and merits outlawing, why shouldn't it be outlawed regardless of who does the subverting? As the bill now reads, a Jimmy Hoffa or Dave Beck can subvert the president of the Retail Clerks Union by paying him to give up an organizing campaign so that the Teamsters can take it over, and no crime is committed. But if an employer in the steel industry gives something of value to his acquaintance, the head of a textile workers union, to persuade him to influence his union to change its political line,

that would be a crime under the bill. A minority amendment to make it a crime for *any person* (not merely an employer) to subvert a union official was rejected.

*Id.* at 494–95 (emphasis in original). The House Report is also consonant with this understanding of subsection (a)(4):

Section 505 of the committee bill amends section 302 of the Labor-Management Relations Act of 1947 to make it unlawful for any employer or association of employers or any person who acts as a labor relations consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value (1) to any representative of his employees, or (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer, or (3) to any officer or employee of a labor organization with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

*Id.* at 768.

Although case law construing Section 302(a)(4) is scarce, the decision of the court in *United States v. Ferrara*, 458 F.2d 868, 873 (2d Cir.1972), *cert. denied*, 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972), is clearly in accord with this Court's reading of the statute. In *Ferrara*, union officials representing workers at Walgreen Company agreed to pressure their membership to give up free food privileges embodied in their collective bargaining agreement if Walgreen would agree to buy coffee from a certain supplier. Walgreen agreed, and the union officials received a kickback from the coffee company. The union officials were convicted for accepting the kickback payments in exchange for influencing the contract negotiations for the Walgreen employees.

■ This Court concludes that, if all other prerequisites under 29 U.S.C. § 186(a)(4)

can be met, the fact that the union employees who the stewards are accused of attempting to influence were not employees of the plaintiff does not bar a claim for violation of that subsection.

■ Plaintiff also contends that summary judgment is appropriate because the defendant has failed to rebut Mr. Kelly's affidavit testimony that the payments were not made with the requisite intent. However, the Court notes that Mr. Kelly has not denied that payments to the stewards were made. It is well established that summary judgment "should be granted only where it is perfectly clear that there is no dispute about either the facts of the controversy *or the inferences to be drawn from such facts.*" *Central National Life Insurance Company v. Fidelity and Deposit Company of Maryland,* 626 F.2d 537, 539 (7th Cir.1980) (emphasis in original). Plaintiff has failed to refute the defendant's claim that plaintiff and defendant are competitors, that their publications are sold by vendors at Chicago area racetracks, and that plaintiff has made cash payments to the union stewards for those vendors. An inference that those payments were given to the stewards to influence their performance of their union functions could reasonably be drawn by the trier of fact. Moreover, as the *Central National Life* court noted, "[w]here intent is a controlling element, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be judged by the trier of facts after observation of the witnesses during direct and cross-examination." 626 F.2d at 540 n. 6.

■ Plaintiff also alleges that defendant has failed to adequately plead that Wabash is an employer and the vendors are employees as those terms are defined under the statute. *See,* 29 U.S.C. § 152(2), (3). The Court notes that Mr. Kelly's affidavit indicates that the vendors are employees of the racetracks. Given this record, it appears that the statutory definitions are met. However, the Court will dismiss Count IX

with leave to amend within 30 days to enable defendant to adequately so plead, if he can do so in good faith.

Plaintiff raises a similar objection with regard to subsection (a)(4)'s requirement that Local 706 constitutes "a labor organization engaged in an industry affecting commerce." Defendant has pled only that Local 706's members operate the vending stands at Chicago area racetracks. Although other courts have found that horse-racing is an "industry affecting commerce," as that term is defined at 29 U.S.C. § 142(1), see, *Pari Mutuel Clerks Union of Louisiana v. Fair Grounds Corporation,* 703 F.2d 913, 919–20 (5th Cir.1983), *cert. denied,* 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983), defendant must so plead. Therefore, should defendant choose to amend and refile Count IX, this omission must also be cured.

Finally, plaintiff contends that defendant's RICO counterclaim is barred by the applicable statute of limitations. This Court has adopted a two-year statute of limitations for RICO claims. *See, Chicago v. North Austin Investment Corporation,* No. 85 C 0441, slip op. at 8 (N.D.Ill. December 24, 1985) [Available on WESTLAW, DCTU database]. *Accord, Electronics Relays (India) Pvt. Ltd. v. Pascente,* 610 F.Supp. 648, 649–653 (N.D.Ill.1985).

Defendant's counterclaim indicates that the alleged payments have continued to the present, and Mr. Kelly's affidavit does not deny that claim. In fact, it admits payments over a 25–year period. Assuming *arguendo* that these payments were violative of Section 302(a)(4), each payment constitutes a separate violation. *United States v. Boffa,* 688 F.2d 919, 934 (3rd Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *United States v. Donovan,* 339 F.2d 404, 405 (7th Cir.1964), *cert. denied,* 380 U.S. 975, 85 S.Ct. 1338, 14 L.Ed.2d 271 (1965).

The Court finds that defendant's RICO claim herein is analogous to a claim of damages resulting from a continuing conspiracy under the antitrust laws. In effect, defendant claims plaintiff and the union

officials conspired to destroy his business. *Cf.,* Count VII of the defendant's counter-claim, which is predicated on an antitrust theory. Thus, the Court finds case law concerning the operation of statutes of limitation in cases of a continuing antitrust conspiracy to be instructive.

In *Zenith Radio Corp. v. Hazeltine*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971), the Supreme Court noted that a cause of action under the antitrust laws "accrues and the statute begins to run when a defendant commits an act that in-jures a plaintiff's business ... In the con-text of a continuing conspiracy to violate the antitrust laws ... this has usually been understood to mean that each time a plain-tiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limita-tions runs from the commission of the act."

Applying these principles to this ac-tion, defendant may claim for damages suf-fered as a result of injurious acts done by the plaintiff during the two-year period pri-or to defendant's filing of his counterclaim. Since plaintiff has failed to show that the injurious acts complained of in the counter-claim ended more than two years prior to the filing of the counterclaim, defendant's claim is not barred by the statute of limita-tions.

*Motion to Compel Discovery*

Plaintiff has moved to compel de-fendant to respond to plaintiff's interrog-atory number 2 and request for production of documents number 5. Both requests attempt to elicit information concerning de-fendant's sources of information used in the preparation of his tip sheets. Plaintiff claims that the requested information is relevant to the quality of defendant's prod-uct and that the quality of defendant's product is relevant to the issue of trade-mark infringement. The Court notes that proof that the quality of defendant's prod-ucts is poor is not necessary for plaintiff to prevail on its trademark infringement claim. As the court noted in *Waples-Plat-ter Companies v. General Foods Corp.,* 439 F.Supp. 551, 574 (N.D.Tex.1977),

since the relevant consideration is the prior user's loss of exclusive control over his mark and his good will, the actual quality of the subsequent user's product is normally immaterial. Even if the sub-sequent user's product is of a higher quality than that of the prior user, the prior user has lost the exclusive control of his mark and his good will and, if there is a likelihood of confusion, has suffered infringement.

*See also, Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982); *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 276 (7th Cir.1976), *appeal after remand,* 572 F.2d 574 (7th Cir.1978). However, as-suming the relevance of proof of inferior quality to the issue of actual damages, the Court finds plaintiff's argument unpersua-sive. The measure of the quality of de-fendant's product is the accuracy of his predictions. Defendant has already agreed to provide information concerning that question though responses to plaintiff's in-terrogatory number 6. As defendant notes, "[i]t is not necessary, in order to verify the accuracy of *what* Defendant publishes, to find out from Defendant *where* and *how* he obtains the information to make his decisions." Defendant's re-sponse at 3 (emphasis in original). More-over, the Court cannot ignore the fact that these parties are competitors. Any mini-mal relevance that the requested informa-tion may have is substantially outweighed by the obvious harm that disclosure would entail to defendant's competitive position. *Cf.,* Fed.R.Civ.P. 26(c)(7).

CONCLUSION

Plaintiff's motions for partial summary judgment and to compel discovery are de-nied. Count IX of defendant's counter-claim is dismissed with leave to amend, within 30 days and in accordance with this opinion, if defendant can do so in good faith. A status hearing in this action is set for May 16, 1986.