**470 STRATFORD HOLDING COMPANY, Plaintiff,**

v.

**LOCAL 32B–32J, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, Defendant.**

**No. 91–CV–2818 (RJD).**

United States District Court, E.D. New York.

Oct. 27, 1992.

---

Ira Drogin, Todtman, Young, Tunick, Nachamie, Hendler, Spizz & Drogin, P.C., New York City, for plaintiff.

Ira A. Sturm, Manning, Raab, Dealy & Sturm, New York City, for defendant.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

This is an action pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), and the Federal Arbitration Act ("FAA"), to vacate a labor arbitration award. This action arises out of an industrywide economic strike of the building service employees union in New York in late April of 1991. Two members of Local 32B–32J (the "Union"), building service employees at the 470 Stratford Road premises in Brooklyn, New York, walked off their jobs pursuant to the April strike. Upon attempting to return to work three days later at the end of the strike, they discovered they had been permanently replaced. The Union then filed an arbitration demand requesting reinstatement, arguing that the employer had breached the collective bargaining agreement ("CBA"), by refusing to negotiate the terms of a new agreement in good faith after the old agreement expired on April 21, 1991. Ruling for the Union,

the arbitrator reinstated the employees on different grounds—namely, that the employees had been "unjustifiably discharged" in violation of a discharge provision in the CBA. This petition followed.

Defendant Union moves to dismiss this action for a lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), or, in the alternative, for confirmation of the arbitration award. The Union alleges that this Court lacks subject matter jurisdiction because the employer-plaintiff, 470 Stratford Holding Company ("Stratford Holding"), is not engaged in "an industry affecting commerce" as that phrase is defined in the LMRA. The relevant industry to be examined here is the "building services industry," or the "residential apartment house industry." The Union represents superintendents, doormen, and other building service employees. The Union contends that despite the broad jurisdiction afforded district courts under section 301, Stratford Holding is a purely local enterprise not affecting interstate commerce, and that federal jurisdiction is therefore lacking. The Union additionally maintains that because this is a case where the National Labor Relations Board ("NLRB") would decline to exercise its own jurisdiction—citing no authority for this proposition—the district court should defer to the discretionary jurisdictional policies of the NLRB and dismiss this action.

In the alternative, the Union moves to confirm the arbitration award. Arguing that the authority of a district court to vacate such an award is limited, the Union relies primarily on this principle in urging confirmation. It contends that since the arbitrator appears to have based her decision on a particular provision in the CBA— the discharge provision—her ruling is grounded in an interpretation of the agreement and therefore must not be disturbed.

As discussed below, the defendant's motion to dismiss the complaint for lack of subject matter jurisdiction is denied; and the motion to confirm the arbitration award also is denied.

## Background

The following facts are undisputed. The Union is a labor organization in the building services industry engaged in interstate commerce. Its members are employed primarily in the City of New York, as well as on Long Island and in New Jersey. The Union negotiates collective bargaining agreements with multi-employer associations covering employees in the States of New York and New Jersey, and represents over 20,000 employees in those states.

The Union represented the building service employees at the 470 Stratford Road premises. Under the terms of the CBA covering Stratford Road, the agreement's provisions were to continue in full force and effect after the expiration date of the CBA, April 21, 1991, until a new agreement could be reached. See CBA, Article VI, § 1(c). Article VI also provided the terms under which a no-strike provision could be cancelled:

> In the event the parties are unable to agree upon terms of a successor agreement, the Union, upon three (3) days oral or written notice to the Employer, may cancel Article IV of this agreement [the no-strike provision], and then engage in any stoppage, strike or picketing, without thereby causing a termination of any other provision of this agreement, until the successor agreement is concluded.

A separate provision of the CBA prohibited the employer from discharging an employee without justifiable cause:

> Employees shall not be discharged by the Employer except for justifiable cause. If any employee is unjustly discharged, he shall be reinstated to his former position without loss of seniority or rank and without salary reduction. The Arbitrator may determine whether and to what extent, the employee shall be compensated by the employer for time lost.

CBA, Article III, § 3. A further provision requires that the parties submit any dispute or grievance to the Office of the Contract Arbitrator. See CBA, Article V.

Plaintiff Stratford Holding purchased the premises at 470 Stratford Road on April 11, 1991, ten days prior to the expira-

tion date of the CBA, and agreed to comply with the terms of the CBA. On April 21, 1991, the Union commenced an economic strike in the borough of Manhattan. About one week later the strike was extended to encompass the boroughs of Queens and Brooklyn, and included the two employees at Stratford Road. The Union gave Stratford Holding no oral or written notice of the strike.[1] Three days later the strike ended, and the two striking employees returned to work to learn they had been permanently replaced by non-union workers. They did, however, retain certain recall rights if positions became available in the future. On May 8, 1991, the Union filed a demand for arbitration, and the decision reinstating the two employees issued on May 12, 1992. The arbitrator summarily concluded that the employees had been discharged without just cause, in violation of Article III, § 3 (quoted *supra*).

### Discussion

I. *Motion to Dismiss under Rule 12(b)(1)*

For the reasons discussed in open court, and for those set forth below, defendant's challenge to this Court's jurisdiction must fail.

Preliminarily, the Court notes that plaintiff brought this action based upon section 301 of the LMRA, or alternatively, upon section 10 of the FAA. However, as the defendant correctly points out, section 10 of the FAA does not confer subject matter jurisdiction on the district court; it merely prescribes the procedures to be followed when an *independent* basis for federal jurisdiction exists. *Harry Hoffman Printing, Inc. v. Graphic Communications Int'l Union, Local 261*, 912 F.2d 608, 611–12 (2d Cir.1990). This Court therefore need only address whether jurisdiction has been conferred pursuant to section 301.

■ For a district court to entertain jurisdiction under section 301, there must be a claim of a violation of a contract between an employer and a labor organization, and the labor dispute must concern an *"industry* affecting commerce" as defined under the LMRA. *See Pari–Mutuel Clerks Union of Louisiana, Local 328 v. Fair Grounds Corp.*, 703 F.2d 913, 918 n. 4 (5th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983). The precise jurisdictional question at issue here is whether the plaintiff meets the "industry affecting commerce" requirement. The LMRA defines this requirement as,

> . . . any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or the flow of commerce.

29 U.S.C. § 142(1). Whether this jurisdictional requisite is met is a question of law. *United States v. Ricciardi*, 357 F.2d 91, 96 (2d Cir.), *cert. denied*, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 840 (1966). The focus of this inquiry should not be on whether any employer or any labor organization engages in activity that affects interstate commerce, but instead, whether the flow of commerce could be affected or impeded as a result of a labor dispute between an employer and a labor organization within a specific industry. This approach establishes a "relevant industry" test: a court must determine what the relevant industry is, and then analyze whether, in the event of a labor dispute between employers and unions within that industry, commerce may be affected or impeded. *Id.* at 95 ("the relevant industry . . . comprises all business activities in the same field as the business activities of employers whose employees were [affected]"). As noted above, the "relevant industry" here is the building services industry.

■ Under *Ricciardi*, this Court's jurisdiction over a dispute arising within the building services industry is evident. *Ricciardi* affirmed the convictions of two officers of a union representing building superintendents in small apartment buildings in various parts of New York for demanding and receiving money from union employees. The officers challenged their convictions on jurisdictional grounds, and the Sec-

---

1. At the arbitration hearing the Union argued that although Stratford Holding had no direct oral or written notice of the strike, it had "con-structive notice" of the strike because of the coverage in the media.

ond Circuit held that the district court correctly charged the jury that the "relevant industry" was not just comprised of those entities where the unlawful payments had occurred, but also included a broad range of smaller apartment houses, whether or not they even had contracts with the Union.

■ Defendant has conceded at oral argument that upon the undisputed facts in this case, its motion must be denied if this Court relies on *Ricciardi* as binding precedent. Defendant contends, however, that *Ricciardi* is not controlling, arguing that the district court may not exercise its jurisdiction where the NLRB would decline to do so. The Second Circuit has squarely rejected this proposition in a recent case. *See Eatz v. The DME Unit of Local 3,* 973 F.2d 64, 69 (2d Cir.1992). *Eatz* follows other circuits to hold that the non-discretionary jurisdiction conferred by section 301 is separate and independent from the discretionary jurisdiction of the NLRB. *E.g., Pari–Mutuel, supra* (cited with approval in *Eatz*). Whether or not the NLRB has, or would, decline jurisdiction over a dispute of this nature is not controlling here. The simple fact that the NLRB fails to assert jurisdiction over a particular dispute has no bearing on whether jurisdiction is available under section 301; and, in this case, federal jurisdiction does exist.

Similarly, the fact that there is currently a state action pending does not alter the district court's inquiry into the scope of its own jurisdiction. *See Ricciardi, supra,* at 94–95; *Pari–Mutuel, supra,* at 919 & n. 7 (state and federal courts possess concurrent jurisdiction to adjudicate actions brought under section 301). Plaintiff filed a parallel suit in New York State Supreme Court in early September of 1992. The Union in its reply affirmation suggests that the filing of the state suit indicates that "[a]pparently the Employer now concedes that the federal court is not the proper forum, given that the Employer has now commenced an identical action in State court seeking identical relief." Sturm Reply Affidavit, September 15, 1992. This argument warrants only a brief response. Plaintiff has made no such concession, and

as the *Pari–Mutuel* court aptly points out, "[i]t would be inane and illogical to require the federal district court in this case to defer to state court resolution of a labor dispute, when the federal law of labor relations would control the state adjudication." *Id.* at 919.

Defendant's other arguments as to jurisdiction are without merit. In light of *Ricciardi,* this Court's jurisdiction is clear, and defendant's motion pursuant to Fed. R.Civ.P. 12(b)(1) is denied.

## II. *Motion to Confirm the Arbitrator's Award*

■ Defendant's motion in the alternative to confirm the arbitration award also must be denied. Although the Court's authority to vacate such awards is narrowly circumscribed, in this instance the arbitrator exceeded her authority under the CBA in reinstating the two employees to their positions at 470 Stratford Road. With virtually no analysis or explanation, the arbitrator unjustifiably modified the CBA to preclude the lawful hiring of permanent strike replacements in economic strike situations. Relying on an unrelated employee discharge provision, the arbitrator stated only that, "after careful consideration of the evidence presented and arguments advanced by the parties at the hearing and in their post-hearing briefs, I find that there was not justifiable cause for the discharge of the grievants." Arbitrator's Decision, at 18. While it is certainly true that an arbitrator is not required to offer a detailed rationale for her award, see *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), she may not simply disregard the unambiguous terms of a collective bargaining agreement in order to dispense "her own brand of industrial justice." *Id.* at 597, 80 S.Ct. at 1361. In this case the arbitrator did just that, reaching out beyond the essence of the agreement to arrive at her decision. The award therefore cannot stand.

### *Standard of Review*

■ In general, the scope of a district court's review of an arbitration award in a

labor dispute is extremely limited. As the Supreme Court has admonished, "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of [her] authority, that a court is convinced [she] has committed serious error does not suffice to overturn [her] decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). The court may not substitute its own interpretation even if convinced the arbitrator is plainly wrong. *See Local 1199 v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir.1992) (citations omitted). Nor may a paucity of analysis or reasoning on the part of the arbitrator alone serve as grounds to refuse to enforce an award. There is no general requirement that an arbitrator explain the reasons for her award, see *Landy Michaels Realty Corp. v. Local 32B–32J*, 954 F.2d 794, 797 (2d Cir.1992); instead, an arbitration award should be enforced if there is a "barely colorable justification for the outcome reached." *Id.* (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir.1978)). The Court "must determine first whether the arbitrator acted within the scope of [her] authority, and second whether the award draws its essence from the agreement or is merely an example of the arbitrator's own brand of justice." *Local 1199, supra*, at 25.

▮ At the same time, however, the authority of the arbitrator is limited to the powers that the collective bargaining agreement confers. An arbitrator may not shield a decision from judicial review "simply by making the right noises—the noises of contract interpretation." *Leed Architectural Products, Inc. v. United Steelworkers, Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990) (quoting *In re Marine Pollution Service, Inc.*, 857 F.2d 91, 92 (2d Cir.1988)). The arbitrator is not empowered to modify or amend the agreement, and must accept the agreement as the exclusive statement of the parties' rights and obligations and the product of their efforts at the bargaining table. *Leed*, 916 F.2d at 65–66; *see also Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 186 (7th Cir. 1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct.

1184, 89 L.Ed.2d 300 (1986). The arbitrator may look to extrinsic evidence to make her determination, but under no circumstances may she impose a remedy that is directly at odds with the express language of the collective bargaining agreement. *Local 1199, supra*, at 25. In sum,

> When it is clear that the arbitrator *'must* have based [her] award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference, either ...)' ... the arbitrator has failed to draw the award form the essence of the collective bargaining agreement.

*In re Marine Pollution*, 857 F.2d at 94 (citation omitted) (emphasis in original).

▮ Additionally, a court always retains the residual power to refuse to enforce an arbitrator's award if it is wholly contrary to public policy. *See Newsday, Inc. v. Long Island Typographical Union, No. 915*, 915 F.2d 840, 844–45 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991). In making this determination, a court examines whether the public policy at stake is well-defined and dominant, and whether it may be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Misco, supra*, 484 U.S. at 42–43, 108 S.Ct. at 373.

The Union makes noises that because this Court's authority is restricted, the arbitrator's handiwork must not be undone. Yet beyond these general proclamations, the Union has failed to advance any persuasive analysis in support of its motion to confirm this award. Here, the arbitrator has overstepped her authority fundamentally to alter the terms of the collective bargaining agreement, and the Court is obligated to exercise its limited authority to vacate the arbitration award.

The arbitrator's attempts to justify her decision as grounded in an employee discharge provision is simply unsupported by the plain language of the CBA. No provision in the CBA relates to the rights of striking employees once they have been

permanently replaced, or links those rights in any way to the provision concerning employee discharge. Indeed, there is nothing in the CBA that mentions permanent replacement workers at all, or sets any limitations or restrictions on the employer's statutorily-protected right to hire and retain other workers in the event of an economic strike.[2] The arbitrator's artful dodging in this regard is not the product of erroneous contract interpretation, but rather of unauthorized contract modification, inserting into the CBA certain employee reinstatement rights not previously contained within the four corners of the document. *See Ethyl Corp., supra.* The mere fact that the arbitrator purports to base this determination on a contractual hook, making the right "noises of contract interpretation," does not in fact relieve her of the obligation to engage in the sort of *actual* contract interpretation so patently lacking here.

That the arbitrator based her award on some "thought, or feeling, or policy" outside of and apart from the CBA, is further betrayed by the fact that her decision focused principally on a single issue—the question of justifiable discharge—that the Union raised almost offhandedly in only one sentence of its post-hearing brief. At the arbitration hearing the Union argued chiefly that Stratford Holding had violated Article VI, § 1(c) of the CBA—the provision governing negotiations of a new collective bargaining agreement—by refusing to negotiate a successor agreement in good faith, and by failing to reinstate striking workers while the *old* agreement was still in full force and effect. Rather than consider the Union's argument that the employer had failed to negotiate a new agreement in good faith, however, the arbitrator simply held that the old CBA remained in effect after its expiration date, and then noted that only one issue remained to be resolved, to wit: "whether there was justi-

fiable cause for the discharge of grievants . . ., and, if not, what shall be the remedy?" Arbitrator's Decision, at 16. The arbitrator then concluded—without discussion or analysis—that the two workers had been unjustifiably discharged and that the CBA required reinstatement.[3]

The Court notes in passing that the Union offered no concrete evidence that the employer breached the CBA by a bad faith refusal to negotiate, and thus it is unsurprising that the arbitrator did not rest her decision on this ground. In fact, the only evidence on the issue comes from the plaintiff, in a letter dated April 12, 1991, following plaintiff's purchase of the premises; and that letter plainly evidences the plaintiff's willingness and intent to negotiate a successor agreement. *See* Affidavit of Ira Drogin, Exhibit "B." Despite this unmistakable evidence of plaintiff's *good faith*, the arbitrator simply ignored the Union's claims to the contrary, resting the decision instead on what could only be characterized as her "own brand of industrial justice." *Enterprise Wheel, supra.*

Research has uncovered no decision which would alter the conclusion that the arbitrator's award cannot be confirmed. The scant case law uncovered only by the Court involving an arbitrator's interpretation of discharge provisions to support reinstatement of employees over permanent replacements is easily distinguishable from the instant matter, see, e.g., *Myers v. Parex, Inc.,* 689 F.2d 17 (2d Cir.1982); *Edna H. Pagel, Inc. v. Teamsters Local Union 595,* 667 F.2d 1275 (9th Cir.1982); in these cases the discharge provisions in the collective bargaining agreement were either directly linked to the parties' rights during a strike or picket situation, or were read in conjunction with other provisions limiting the employer's right to hire permanent strike replacements. That is, in both cases there was at least a "colorable justifica-

---

**2.** The rights of an employer to hire and retain permanent strike replacements is briefly outlined *infra,* at 126.

**3.** As noted *supra,* the Union also argued that although Stratford Holding had no direct notice of the strike, "constructive notice" existed due to media coverage. This issue was addressed by the arbitrator only to the extent she found that the CBA remained in full force and effect after its expiration date until a new agreement had been reached.

tion" for the contract interpretation furnished, and some reason to relate the respective discharge provisions to the issue of permanent replacement workers.

For example, the collective bargaining agreement in *Myers* provided clear limitations upon the employer's right to hire permanent replacement workers during a strike. One section required the employer to use the Union's employment service for replacement hires and to give advance notice to the Union steward of the hirings. Another provision prohibited employee lockouts, and yet a third required advance written notice and just cause before any employee could be discharged. *Id.* at 18. In *Myers*, full-time employees of the defendant struck, and the part-time employees honored the full-time workers' picket line. Later attempting to return to work, the part-time employees learned they had been permanently replaced, and the Union demanded arbitration. The Arbitrator's decision relied upon all of the provisions described above to order the reinstatement of the part-time employees, finding specifically that the employer "had failed to notify its part-time employees that they would be replaced if they refused to cross the picket lines and that, by refusing to reinstate those employees, [the employer] had engaged in a lockout." *Id.* Affirming the district court's confirmation of the award, the Second Circuit looked to the operation of all of these provisions to hold that the Arbitrator's award was not so clearly erroneous as to warrant vacatur. The Circuit noted,

> Though the arbitrator's opinion explaining his award is not unambiguous, it is *evident* that he considered the replacement of the part-time employees to be a discharge within the meaning of [the collective bargaining agreement], and it is fairly inferable that he construed the requirement of "notice" to mean not merely advance warning that a discharge will occur but also advance warning of what would constitute a ground for a discharge.

*Id.* (emphasis added). In *Myers* the agreement plainly contemplated reasonable restrictions upon the hiring of permanent replacement workers. Thus, where the collective bargaining agreement directly provided for some limited relinquishment of the employer's rights to hire replacements during an economic strike—i.e., the requirement of notice and the requirement to consult with the Union employment service—it was not wholly implausible for the arbitrator to read the discharge provision in conjunction with these requirements to compel reinstatement of the part-time employees.

In *Pagel*, four maintenance men at the Pagel company went on strike when negotiations over a new collective bargaining agreement reached an impasse, and their co-workers—drivers and warehousemen—individually chose to respect the maintenance workers' picket line.[4] The strike lasted four months, after which the drivers and warehousemen were told they had been permanently replaced, and would be reinstated according to seniority and qualifications if and when jobs became available. The matter was submitted to arbitration, and the arbitrator ruled that a provision in the collective bargaining agreement prohibiting discharge of an employee for refusal to cross a legitimate picket line precluded the employer from hiring permanent replacements. The Ninth Circuit, without endorsing the arbitrator's reading of the contract, upheld the award in light of this already bargained-for condition, observing that, "The arbitrator interpreted the prohibition against discharge to preclude permanent replacements of employees who exercised this contractually-protected right." *Id.* at 1279. Thus the discharge provision at issue in *Pagel* was explicitly imposed as a regulation of the employer's rights in the strike context, and fairly could be read to circumscribe the employer's options during a strike situation.

The collective bargaining agreement here furnishes no similar justification. No such

---

**4.** Provisions in the pertinent collective bargaining agreements allowed such actions by one union's members in support of a strike authorized by the co-workers' union.

restrictions on an employer's right to hire strike replacements can be found anywhere in the collective bargaining agreement in this case so as to furnish a basis for the arbitrator's award in favor of the Union. *See Teamsters Local 814 v. Sotheby's, Inc.,* 665 F.Supp. 1089, 1095 (S.D.N.Y.1987) (although arbitrator need not give precise reasons for award, courts should not create valid reasons out of "thin air" for awards exceeding the scope of arbitrator's authority). No direct connection, or even a suggestion of a connection, between the discharge provision and the respective rights of the parties during a strike situation exists in the CBA; nor may it be inserted by the arbitrator's well-intentioned sleight of hand.

Finally, the arbitrator's explication of the CBA contravenes the well-defined and dominant federal labor policy that allows employers, during an economic strike, to hire permanent replacements for striking workers. *NLRB v. MacKay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Even the Union concedes that the National Labor Relations Act ("NLRA"), permits an employer to hire permanent strike replacements. The striking worker generally has the right to be reinstated once the labor dispute is resolved, *see NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967), and retains that right so long as he is an "employee" under the NLRA. *Id.* at 381, 88 S.Ct. at 547. Concomitantly, the employer has the right, for legitimate and substantial business reasons, to hire and retain workers as permanent replacements in order to continue operations. *See Mac-Kay, supra,* 304 U.S. at 345–46, 58 S.Ct. at 911; *see also Waterbury Hosp. v. NLRB,* 950 F.2d 849, 854–55 (2d Cir.1991) (reviewing case law).[5] The separate question of what constitutes a "justifiable discharge" simply has nothing to do with this balance of competing interests, and the fact that a collective bargaining agreement includes a

justifiable discharge provision in no way indicates that the employer waived his statutorily-protected rights to hire permanent replacement workers. *See Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 705–10, 103 S.Ct. 1467, 1475–78, 75 L.Ed.2d 387 (1983) (under federal labor policy waiver of statutorily-protected right must be clear and unmistakable, and may not be inferred from general contractual provisions); *see also Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 279–84, 76 S.Ct. 349, 356–58, 100 L.Ed. 309 (1956); *NLRB v. New York Telephone Co.,* 930 F.2d 1009, 1011–1013 (2d Cir.1991). Accordingly, the award may be vacated on this policy ground as well. *See Misco, supra.*

The Court therefore holds that the arbitrator's decision to award reinstatement to the two striking employees is unsupported by the terms of the collective bargaining agreement.

Defendant's motions are denied; and the arbitration award of May 12, 1992 is hereby vacated. The Clerk of the Court is directed to enter judgment for the plaintiff in accordance with this opinion.

SO ORDERED.

---

**5.** This principle applies even to employees who cross picket lines to be assigned to permanent positions other than those they occupied before the strike. *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 435–38, 109 S.Ct. 1225, 1231–32, 103 L.Ed.2d 456 (1989). And, in certain circum-

stances, promises to permanent replacements that they will maintain their positions regardless of the outcome of the economic strike satisfies the "legitimate and substantial business justification" standard. *See Belknap, Inc. v. Hale,* 463 U.S. 491, 504 n. 8, 103 S.Ct. 3172, 3179–80 n. 8, 77 L.Ed.2d 798 (1983).